**In re Robert and Marilyn DeLUCA, Debtors.**

**Joel T. BROYHILL et al., Plaintiffs,**

v.

**Robert and Marilyn DeLUCA, Defendants.**

**Bankruptcy No. 95–11924–AM.**
**Adv. No. 95–1181.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Jan. 2, 1996.

Joseph S. Luchini, Hazel & Thomas, P.C., Falls Church, VA, for Joel T. Broyhill.

Eric J. Berghold, McCandlish & Lillard, Fairfax, VA, for Northern Virginia Realty, Inc. Profit Sharing Trust.

Harvey B. Cohen, Cohen, Gettings & Dunham, P.C., Arlington, VA, for Robert and Marilyn DeLuca.

Stanley M. Salus, Wickwire Gavin, P.C., Vienna, VA, Chapter 11 trustee.

Frank Bove, Attorney–Advisor, Office of the United States Trustee, Alexandria, VA.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

■ In this action, the plaintiffs, Joel T. Broyhill and Northern Virginia Realty, Inc. Profit Sharing Trust seek a declaration that the defendants, Robert and Marilyn DeLuca, were properly removed as the managers of D & B Countryside, L.L.C., and that Joel T. Broyhill was properly appointed as the successor manager.[1] A trial of the issues was held on September 15 and 18, 1995. At the conclusion of the evidence, the court took the matter under advisement and invited the parties to submit post-trial briefs. The parties have done so, and the matter is now ripe for decision.[2]

---

1. Northern Virginia Realty, Inc. Profit Sharing Trust ("NVRI") was named in the complaint as a defendant but at its request was realigned by the court at trial as a plaintiff in recognition of its actual interest, which was consistent with that of Joel T. Broyhill and adverse to that of Robert and Marilyn DeLuca. D & B Countryside was also named in the complaint as formal party defendant, but was subsequently, over the objection of the plaintiffs, dismissed by the court as a party, since no relief was sought against it.

2. The DeLucas have requested the court to stay the issuance of a final order or judgment pending settlement. During the period the court has had this matter under advisement, the DeLucas and ten of the DeLuca entities, including D & B Countryside, have filed a joint plan of reorganization, subsequently amended, which would, if confirmed, resolve all existing controversies between Broyhill and the DeLucas. With respect specifically to D & B Countryside, management control would be transferred to Broyhill upon approval of the disclosure statement, and the DeLucas' equity interest would be transferred to Broyhill, in exchange for Broyhill's interest in certain other entities, on plan confirmation.

### Findings of Fact

D & B Countryside, L.L.C., ("D & B Countryside") is a Virginia limited liability company that was formed on April 12, 1994 to develop a shopping center and office development in Sterling, Virginia, known as Parc City Centre. The project originally consisted of approximately 12 acres, but at the present time there remain 3.766 acres which are intended to be subdivided into four retail "pad sites." [3] The original members of the company were Joel T. Broyhill ("Broyhill") and Robert and Marilyn DeLuca ("the DeLucas"). The organization of the company was set forth in an Operating Agreement dated April 12, 1994 ("the operating agreement"), signed by Broyhill and the DeLucas. Under the terms of the operating agreement, Broyhill and the DeLucas were each 50% members,[4] and the DeLucas were named as joint managing members. The operating agreement stated that the manager of the company must be appointed by unanimous vote [5] but was silent on removal of a manager. The operating agreement further required written consent of the other members for the assignment or pledge of a member's interest.[6] Finally, the agreement provided in ¶ 9.1 for the dissolution of the company on December 31, 2024 or the earlier occurrence of certain specified events, including

> (c) the death, resignation, expulsion, bankruptcy or dissolution of a Member ... unless the business of the Company is continued by the unanimous consent of the remaining Members
>
> . . . .

With respect to termination occurring because of the death, resignation, expulsion, bankruptcy or dissolution of a member, ¶ 9.2 of the agreement further provided

> the business of the Company shall be continued on the terms and conditions of this Agreement if, within ninety (90) days after such event, the remaining Members elect in writing that the business of the Company should be continued and, if the Affected Member was also the only Manager, elect a new Manager. . . .

Under the terms of the operating agreement, Broyhill and the DeLucas were each to make $1,000,000 capital contributions;[7] any further contributions were to be made pro rata. This would have resulted in $2,000,000 of paid-in capital, but from the testimony it appears that significantly less was actually

---

Broyhill and NVRI oppose any stay of judgment and urge the court to enter a judgment notwithstanding the proposed settlement, since the settlement is dependent upon plan confirmation, which is by no means assured. The court concurs that, at least at this point, the controversy has not become moot: the proposed joint plan, while not unconfirmable on its face, embodies a number of problematical provisions, and creditors in a number of the cases have objected vigorously. While there is an obvious judicial economy to be achieved in not issuing a formal ruling where the matter may become moot in another month or two, at the same time the court must consider the adverse effect of further delay on the administration of justice and on the rights of the parties if the proposed settlement is ultimately not consummated. Accordingly, the motion to stay the issuance of the court's ruling will be denied.

3. The fair market value of the property is listed on D & B Countryside's schedules at $3,625,000.

4. "5.1. *Contributions and Membership Interests.* Simultaneously with the full execution of this Agreement, Broyhill shall make an initial cash contribution to the Company in an amount equal to $1,000,000 and R. DeLuca and M. DeLuca shall each make an initial cash contribution to the company in an amount equal to $1,000,000 for a total of $2,000,000. Thereupon, each Member shall have an interest in the Company expressed as a percentage of the whole ("Membership Interest"). The Membership Interest of R. DeLuca and M. DeLuca jointly shall be fifty percent (50%) and the Membership Interest of Broyhill shall be fifty percent (50%)."

5. "6.1. *Appointment of Manager.* The management of the affairs of the Company shall be vested in one or more managers (the "Manager") elected by the unanimous vote of the Members."

6. "8.1. *General.* No Member may pledge, mortgage, hypothecate, assign or otherwise transfer its interest in the Company without the prior written consent of the other Members."

7. Actually, the Agreement literally states that Broyhill would contribute $1,000,000 and that the DeLucas would *each* contribute $1,000,000. It would appear, however, that the word "each" is a scrivener's error, and that the actual intent was an aggregate initial capitalization of $2,000,000—$1,000,000 from Broyhill and $1,000,000 collectively from the DeLucas.

paid in.[8] The source of the capital funds for both Broyhill and the DeLucas was a $1,500,000 loan from NationsBank. Broyhill testified his understanding was that the entire loan proceeds were to be paid to D & B Countryside. In fact, as it turns out, only $200,000 of the loan proceeds were actually deposited in D & B Countryside's bank account.

In July 1994, the DeLucas solicited Theodore Boinis ("Boinis"), the president of Northern Virginia Realty, Inc. ("NVRI") and trustee of its profit sharing plan, to become a member and offered him a 15% interest in the company in exchange for a $600,000 investment. Additionally, the DeLucas offered to personally guarantee a 10% minimum rate of return on NVRI's investment. NVRI agreed to the proposal and wire-transferred the $600,000 to D & B Countryside's bank account on July 22, 1994. Within a week, $594,300 of those funds had been transferred to other DuLuca-related entities or Robert DeLuca personally. Sometime later (apparently in September), Boinis and the DeLucas signed an Amended and Restated Operating Agreement dated "as of July 22, 1994" ("the amended operating agreement"), which assigned to the NVRI Profit Sharing Trust[9] a 7.5% portion of the Deluca's interest in the company and a 7.5% portion of Broyhill's interest.[10] Although the DeLucas told Boinis that the amended operating agreement would be sent to Broyhill for signature, it never was, and was never signed by Broyhill. Broyhill testified at trial that, although he had not seen the amended operating agreement until approximately mid-January, 1995, he had no objection to any of its provisions except for language in one paragraph acknowledging his having "received all amounts and other consideration due ... on account of this membership assignment." ¶ 1.4. Indeed, in a memorandum to the DeLucas dated September 27, 1994, Broyhill acknowledged the existence of NVRI's 15% interest and registered no protest.

Beginning in September or October 1994, the relationship between the DeLucas and Broyhill soured, largely because the DeLucas did not respond to a number of requests by Broyhill for information concerning his investment. After Broyhill learned that almost

8. To say that the details of D & B Countryside's capitalization are murky would be an understatement. Marilyn DeLuca testified that the actual initial capital contribution was $400,000 ($200,000 each for Broyhill and the DeLucas). An accountant who examined D & B Countryside's financial records for Broyhill reconstructed the capitalization in a chart (Plaintiff's Exhibit 63) that resembles one of Rube Goldberg's creations. Of the $1,500,000 loaned by NationsBank to Broyhill and the DeLucas personally, $200,000 went into D & B Countryside's operating account, $800,000 went into the DeLucas' personal account, and $500,000 went to the operating account of Kiln Creek Golf & Country Club ("Kiln Creek"), an entity in which both Broyhill and the DeLucas had an interest, apparently to fund Broyhill's capital contribution in that entity. A $1,000,000 investment account of Kiln Creek served as collateral for the NationsBank loan (and, when the loan later went into default, was applied to the debt). As the accountant reconstructed the capital accounts, Broyhill and the DeLucas had each contributed $500,000 (for a $1,000,000 total initial capitalization), but the DeLucas had immediately withdrawn $800,000. After the $600,000 capital infusion by NVRI and the payment to the partners of a total of $454,038 from the sale of the movie theater site to Regal Cinema, the account balances as of August 31, 1995, as reconstructed by the accountant, stood at $307,034 for Broyhill, a *negative* $492,-

966 for the DeLucas, and $531,894 for NVRI. This contrasts with the figures shown on D & B Countryside's December 31, 1994 balance sheet, which reflects capital account balances at that time (prior to the Regal Cinema transaction) of $504,946.83 each for the DeLucas and Broyhill and $600,000 for NVRI. One of the reasons for the difference is that the pledge of the $1,000,000 Kiln Creek investment account (which ultimately was applied by NationsBank to the $1,500,000 loan) was recorded on D & B Countryside's books as part of Broyhill's and the DeLucas' capital investment. For the purpose of this opinion, it is not necessary to make a finding as to the actual capital account balances, since regardless of whether one accepts the figures shown on the debtor's balance sheet (as adjusted for the subsequent distributions from the Regal Cinema sale) or those testified to by the accountant, Broyhill and NVRI had a majority capital as well as membership interest.

9. For convenience, the trust will be referred to in this opinion simply as "NVRI."

10. "1.4 *Assignment of R. DeLuca's, M. DeLuca's, and Broyhill's Interest*. R. DeLuca hereby assigns 3.75% of his interest in and to the Company to NVRI. M. DeLuca hereby assigns 3.75% of her interest in and to the Company to NVRI; and Broyhill hereby assigns 7.50% of his interest in and to the Company to NVRI."

all of the $600,000.00 invested by Boinis had been immediately transferred out of D & B Countryside and that the DeLucas had placed a $3,000,000.00 deed of trust against D & B Countryside's property without his knowledge,[11] Broyhill and NVRI Profit Sharing Trust executed a document on April 14, 1995, purporting to remove the DeLucas as D & B Countryside's managers and electing Broyhill as manager. No notice was given to the DeLucas of the meeting of Broyhill and Boinis at which the document was signed. Written notice was sent to the DeLucas that same date, however, that the action had been taken. In addition, notice was also sent that same date to the attorney who was representing the DeLucas, and who subsequently filed the chapter 11 petition on behalf of D & B Countryside, advising him that the DeLucas had been removed as managers and that he had no authority to represent D & B Countryside or to make any filings for D & B Countryside in the United States Bankruptcy Court. On May 5, 1995, the DeLucas filed a voluntary chapter 11 petition in this court, and on May 9, 1995, they caused D & B Countryside to file a voluntary chapter 11 petition. Subsequent to the DeLucas' petition, Broyhill and NVRI Profit Sharing Trust executed a document in which they elected to continue the business and confirmed the election of Broyhill as the new manager.[12]

At or around the time the DeLucas filed their own petition, they also caused chapter 11 petitions to be filed on behalf of twelve other partnerships, limited partnerships, or limited liability companies, in addition to D & B Countryside, which they owned or controlled ("the DeLuca entities"). In response to vocal creditor complaints related to the DeLucas' management of the various DeLuca entities, the debtor itself moved for appointment of a chapter 11 trustee, and the court granted the motion with respect to ten of the thirteen entities, including D & B Countryside. Stanley M. Salus, Esquire, was appointed as the chapter 11 trustee on June 27, 1995, and is currently serving in that capacity.

### Conclusions of Law

■■■ This court has jurisdiction of this controversy as a "related" non-core proceeding under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference entered by the United States District Court for the Eastern District of Virginia on August 15, 1984.[13]

11. The deed of trust secured a promissory note in favor of S.P. "Chip" Newell that consolidated four prior promissory notes that had been personal liabilities of the DeLucas. The D & B Countryside schedules reflect that $1,250,000 was owed on the date the chapter 11 petition was filed. At the time the deed of trust was placed on the property, the DeLucas executed a borrowing authorization on behalf of D & B Countryside in which they certified that they "are, or have the authority of, all Members" of the limited liability company. In fact, neither Broyhill nor NVRI knew of or consented to the deed of trust.

12. The document, which is captioned "Resolution," is undated but bears a facsimile transmission header dated July 24, 1995 and recites that it was executed "within 90 days of May 5, 1995." Based on the exhibit and the testimony of Boinis and Broyhill, the court finds that the document was executed on or about July 24, 1995 and within 90 days of the chapter 11 filing by the DeLucas.

13. The complaint filed June 15, 1995 alleged that this was a core proceeding under 28 U.S.C. 157(b)(2)(A) and (O). ("matters concerning the administration of the estate" and "other proceedings affecting ... the equity security holder relationship.") NVRI's answer filed July 14, 1995

admitted the allegation concerning core status, however, the DeLucas's answer filed July 24, 1995 *denied* that the matter was a core proceeding. Upon consideration, the court has concluded that the adversary proceeding is non-core. Under 28 U.S.C. §§ 1334, bankruptcy jurisdiction extends to "cases under title 11" and to civil proceedings "arising under," "arising in," or "related to" a bankruptcy case. The first two categories ("arising under" and "arising in") constitute "core" proceedings, with respect to which a bankruptcy judge may enter final judgments or orders, subject to the right to appeal to the U.S. District Court under 28 U.S.C. § 158(a). "In order for a proceeding to 'arise under' Title 11, the claim must be predicated on a right created in Title 11. Examples ... include preference actions and fraudulent conveyance actions. On the other hand, 'arising in' proceedings are those that are not based on any right expressly created by Title 11 but would have no practical existence but for the bankruptcy. Examples would include actions to determine the validity of liens or claims." *Lux v. Spotswood Constr. Loans,* 176 B.R. 416, 418 (E.D.Va.1993) (Merhige, J.) (internal citations omitted). The third category of matters ("related to") are those where "the outcome could in some way alter the parties' rights in bankruptcy or affect the admin-

The parties have consented to the entry of a final order or judgment by a bankruptcy judge, subject to the right to appeal under 28 U.S.C. § 158(a).

There are two major issues raised by the complaint and the evidence. The first is whether the April 28, 1995 action by Broyhill and NVRI was effective to remove the DeLucas as the managers of D & B Countryside and to appoint Broyhill as the successor manager. If not, the second issue is whether the chapter 11 filing by the DeLucas terminated their right to act as manager and permitted Broyhill and NVRI Profit Sharing Trust to elect to continue the business with Broyhill as the manager. Each of these issues will be discussed in turn.

**A. Whether the April 28, 1995 action was effective to remove the DeLucas as managers.**

As noted above, D & B Countryside is a limited liability company. Limited liability companies, although a relatively recent innovation, have become an increasingly popular form of business organization. As explained by one commentator,

> In response to favorable tax rulings, most states recently have followed the lead of Wyoming and Florida and enacted legislation for the formation and recognition of the limited liability company (LLC). The LLC is a form of legal entity that has attributes of both a corporation and a partnership but is not formally characterized as either one. Generally, an LLC offers all of its members, including any member-manager, limited liability as if they were shareholders of a corporation but treats the entity and its members as a partnership for tax purposes.

Thomas F. Blakemore, "Limited Liability Companies and the Bankruptcy Code: A Technical Overview," 13 *Am.Bankr.Inst.J.* 12. In Virginia, limited liability companies are governed by the Virginia Limited Liability Company Act, §§ 13.1–1000 to 13.1–1069, Va.Code Ann. (Supp1991), enacted in 1991. A Virginia limited liability company may engage in any lawful business that a corporation, partnership or other business entity may conduct under Virginia law. § 13.1–1009(17), Va.Code Ann. A limited liability company in Virginia is formed by filing articles of organization with the State Corporation Commission. § 13.1–1010, Va.Code Ann. A person that owns an interest in the company is called a "member." § 13.1–1002, Va.Code Ann. The members may (and in practice invariably do) also enter into an operating agreement which regulates and establishes the conduct of the company's business and the relationship of its members. § 13.1–1023(A), Va.Code Ann. Management of the company is vested in the members in proportion to their capital contributions, as adjusted for additional contributions and distributions, unless the articles of organization or the operating agreement provide that the company will be managed by one or more managers. § 13.1–1022, Va.Code Ann. Managers, if provided for in the articles of organization or operating agreement, are elected by the members. § 13.1–1024(D), Va.Code Ann. In a manager-managed limited liability company, only managers can contract for the company's debts or execute documents for the acquisition, mortgage or disposition of the company's property. § 13.1–1024(G), Va.Code Ann.

In order to determine whether the April 28, 1995 action by Broyhill and NVRI was effective to remove the DeLucas as managers, it is necessary first to resolve just who the members of D & B Countryside were. The DeLucas, in their pleadings and through

---

istration of the estate." *Id.* The distinction is important, because although a bankruptcy judge may hear a non-core "related to" proceeding, the bankruptcy judge may not enter a final judgment or order unless the parties expressly consent; otherwise, the bankruptcy judge submits proposed findings of fact and conclusions of law to the U.S. District Court, "and any final order or judgment shall be entered by the district judge after considering de novo those matters to which any party has timely and specifically objected."

28 U.S.C. § 157(c)(1); Fed.R.Bankr.P. 7012(b) and 9033. The present controversy does not involve any right created by the Bankruptcy Code or which would have no practical existence outside the bankruptcy context; indeed, this is a suit that, although it clearly affects the rights of parties to D & B Countryside's reorganization case, could as easily have been heard in state court were it not for the happenstance that the DeLucas and D & B Countryside are chapter 11 debtors.

counsel, have denied that NVRI became a member of the company because the operating agreement required unanimous consent to assign a membership interest or to admit a new member and Broyhill never signed the amended operating agreement which assigned a portion of Broyhill's and the DeLucas' membership interest to NVRI and recognized NVRI as a member. In addition, counsel for the DeLucas point out that in correspondence, counsel for NVRI referred to his client's investment in the company as a "loan."

 The DeLucas themselves in testimony (as distinguished from their attorneys in argument) candidly admitted on the witness stand that they always regarded NVRI, following its $600,000 investment, as owning a 15% interest in the company. This is consistent with their conduct, in connection with the Regal Cinema sale, in remitting to NVRI a "15% distribution" of the net sales proceeds ($68,105.75 of $454,038.34). Additionally, D & B Countryside's schedules, signed by Robert DeLuca under penalty of perjury, reflect NVRI (although erroneously called "Virginia Realty Trust") as the holder of a 15% equity interest in the company. The DeLucas, by signing the Amended and Restated Operating Agreement, effectively (1) assigned a 7.5% portion of their own membership interest to NVRI and (2) consented to an assignment of a 7.5% portion of Broyhill's interest to NVRI. Although Broyhill never executed a writing explicitly assigning the 7.5% portion of his interest or consenting to the assignment of a similar

portion of the DeLuca's interest, he testified at trial that he consented in fact to both actions, that he had never been sent the amended operating agreement to sign, and that the only reason he would not now sign the amended operating agreement was because of the language acknowledging that he had received all amounts to which he was due on account of the assignment.[14] The requirement in the original operating agreement that any assignment and consent to assignment be in writing is clearly for the protection and benefit of the party whose interest would be adversely affected by the assignment, and that party is free to waive, as Broyhill has done in this case, the requirement of a writing. Accordingly, the court concludes that Broyhill's failure to sign the amended operating agreement did not, under the facts of this case, prevent NVRI from becoming a 15% member of D & B Countryside and that NVRI is in fact the holder of a 15% membership interest.[15]

 As discussed above, the original operating agreement required that the manager of the company be elected by unanimous vote of the members but was silent on removal of an existing manager. The plaintiffs argue, and the court concurs, that where the operating agreement is silent, resort must be had to the statute. In this connection, § 13.1–1024(F), Va.Code Ann. provides,

All managers or any lesser number may be removed in the manner provided in the articles of organization or an operating agreement. *If the articles of organization or an operating agreement does not pro-*

14. Marilyn DeLuca testified that at a meeting held in April, 1995 at Broyhill's office, Broyhill had made a statement to the effect that he was not willing to recognize NVRI as a member and that NVRI's 15% interest should come entirely out of the DeLuca's original 50% interest and not out of Broyhill's. The timing of the meeting (which occurred after Broyhill had commenced a suit against the DeLucas in state court and filed a *lis pendens* against D & B Countryside's property) and surrounding circumstances clearly reflect that the purpose of the meeting was to negotiate a settlement of the dispute between Broyhill and the DeLucas. Accordingly, evidence of Broyhill's statements at the meeting are presumptively inadmissable under Fed.R.Evid. 408, which precludes "[e]vidence of conduct or statements made in compromise negotiations" unless "it is offered for another purpose" (i.e., other than "to

prove liability for or invalidity of the claim or its amount"). Even assuming the proferred testimony properly fell within the "other purpose" exception, the court finds that Broyhill's statements at the meeting were mere posturing and that he did not, at the time NVRI was admitted, oppose its entry or expect that its 15% interest would come solely out of the DeLuca's share.

15. The fact that NVRI's attorney at one point wrote a letter to the DeLucas describing the transaction as a "loan" is not conclusive. It appears that at the time the letter was written the attorney had not had an opportunity to review the relevant documents and was flying somewhat by the seat of the pants in sending out the demand letter.

*vide for the removal of managers,* then all managers or any lesser number may be removed with or without cause *by a majority vote of the members.*

(emphasis added). Since Broyhill's 42.5% interest and NVRI's 15% interest clearly constituted a majority of the membership interest, their joint action removing the DeLucas as managers was, under the plain language of the statute, effective to accomplish its stated purpose. The court rejects the DeLucas' argument that, because the operating agreement required *election* of a manager to be unanimous, *removal* likewise necessarily had to be unanimous. That result simply does not follow. The obvious purpose of the operating agreement was to prevent a manager from being elected who did not enjoy the unanimous support of the members. By April 28, 1995, the DeLucas not only no longer had the unanimous support of the members, their continued retention in office was actively opposed by the majority of the members. Thus, their removal from office by the majority, pursuant to the statute, was not at all inconsistent with the requirement of the operating agreement that a manager had to be elected by unanimous vote.

At the same time, the requirement in the operating agreement for a unanimous vote in order to elect a manager presents an obvious practical difficulty. Since the manager may be removed by a majority, but less than unanimous, vote, the company could well find itself in the difficult and untenable position of having removed a manager but being unable to elect a new one, thereby leaving the company essentially paralyzed. If that were to occur, the only apparent remedy would be a judicial winding up under § 13.1–1047, Va. Code Ann.[16] That potentially is the situation that exists in the present case. Although the April 28, 1995 action was effective to remove the DeLucas as the managers of D & B Countryside, since the plain language of the operating agreement requires a unanimous vote to elect a manager, NVRI and Broyhill could not, by their sole act, elect Broyhill as the new manager, *unless,* as argued by NVRI and Broyhill, the DeLucas' subsequent chapter 11 filing in effect terminated their membership and gave NVRI and Broyhill the right under the operating agreement to elect to continue the business of the company and select a new manager. It is to that question that we must now turn.

B. *The effect of the DeLucas' chapter 11 filing on their management rights.*

As noted above, the operating agreement explicitly provided that the bankruptcy of a member would trigger the dissolution of the company,[17] but that within 90 days of the bankruptcy "event," the remaining members could elect in writing to continue the business of the company and, if the bankrupt member were also the only manager, could elect a new manager. Since Broyhill and NVRI have done precisely that, the question is whether the provisions of the operating agreement are enforceable in bankruptcy or whether, as argued by the DeLucas, they constitute an impermissible "ipso facto" clause which is unenforceable in bankruptcy.

---

16. "On application by or for a member, the circuit court of the locality in which the registered office of the limited liability company is located may decree dissolution of a limited liability company if it is not reasonably practicable to carry on the business in conformity with the articles of organization and any operating agreement."

17. This provision of the operating agreement is consistent with § 13.1–1046, Va.Code Ann., which at the time the DeLucas filed their chapter 7 petition, provided as follows:

A limited liability company . . . is dissolved and its affairs shall be wound up upon the happening of the first to occur of the following events:

\* \* \* \* \* \*

3. Upon the death, resignation, retirement, expulsion, *bankruptcy,* or dissolution of a member or occurrence of any other event that ter-

minates the continued membership of a member in the limited liability company, unless within six months after the event the limited liability company is continued by the consent of all or such lesser percentage or number (but not less than a majority in interest) of the remaining members as may be provided in writing in the articles or organization or operating agreement of the limited liability company.

(emphasis added).

Limited liability companies are a recent innovation. It is not surprising, therefore, that counsel have been unable to cite the court to any cases specifically dealing with this issue in the context of a limited liability company, nor has the court's own research found any such case. As discussed above, limited liability companies are a conceptual hybrid, sharing some of the characteristics of partnerships and some of corporations. "In general, the purpose of forming a limited liability company is to create an entity that offers investors the protections of limited liability and the flow-through tax status of partnerships." Jonathan R. Macey, The Limited Liability Company: Lessons for Corporate Law, 73 Wash.U.L.Q. 433 (1995). In order to achieve the desired goal of pass-through tax treatment, it is necessary under applicable U.S. Treasury Regulations that the company have more of the attributes of a partnership than of a corporation. Macey, *supra;* Treas.Reg. § 301.7701–2(a)(1). In particular, a limited liability company will be treated as a partnership for tax purposes as long as the company does *not* possess the corporate characteristics of (1) continuity of life and (2) free transferability of interests. Macey, *supra;* Rev.Rul. 88–76, 1988–2 C.B. 360, 361. On the other hand, simply because a limited liability company is most closely analogous to a partnership (or limited partnership) for tax purposes, does not mean than it might not be considered a corporation for other purposes. For example, the Bankruptcy Code defines a "corporation" as including, among other entities, a "partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association." § 101(9)(A)(ii), Bankruptcy Code. Under § 13.1–1019, Va.Code Ann., the members of a Virginia limited liability company are not, solely by reason of their membership interest, personally liable for the company's debts, obligations, and liabilities. Nevertheless, for the purpose of analyzing the effect of a member's bankruptcy filing upon the continued exercise of membership rights, it seems most appropriate to treat the relationship among members of a limited liability company as analogous to that of that among the partners of a partnership. In particular, the fact that membership interests in a limited liability company, unlike shares of stock in a corporation, are not freely transferable mirrors the restriction on entry of new members into a partnership, which ordinarily cannot occur without the agreement of all existing members. *See,* §§ 13.1–1039 and 13.1–1040, Va. Code Ann. (although membership interest may be assigned unless assignment is restricted by the operating agreement or articles of organization, the assignee becomes a member only if the members unanimously consent to the assignee's admission; otherwise assignment only entitles the assignees to receive the distributions to which the assignor would be entitled, and does not permit participation in the company's management or affairs.)

Whether the provision in D & B Countryside's operating agreement for dissolution of the company upon the bankruptcy of a member is enforceable depends on the interplay of several section of the Bankruptcy Code. First, under § 541(a) of the Bankruptcy Code, the commencement of a bankruptcy case creates an estate of "all legal and equitable interests of the debtor in property as of the commencement of the case." Furthermore, the debtor's interest becomes property of the estate "notwithstanding any provision in an agreement ... or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor; or (B) that is conditioned on ... the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." § 541(c), Bankruptcy Code. Where the debtor's interest arises under an executory contract,[18] the

---

18. The term "executory contract" is not defined in the Bankruptcy Code, but most courts and commentators have concurred with the definition first proposed by Professor Vern Countryman:

a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would consti-

trustee, or, in a chapter 11 case, a debtor in possession,[19] may, with court approval, assume the contract. § 365(a), Bankruptcy Code. Once assumed, the contract may be assigned "notwithstanding a provisions in an executory contract ..., or in applicable law, that prohibits, restricts, or conditions the assignment of such contract." § 365(f). As with property of the estate generally, the debtor's interest in an executory contract "may not be terminated or modified, and any right or obligation under such contract ... may not be terminated or modified, at any time after the commencement of the case, solely because of a provision in such contract ... that is conditioned on— ... (B) the commencement of a case under this title." The clear intent of these provisions is to preserve, for the benefit of the creditors of the bankruptcy estate, all of the debtor's property rights by making unenforceable so-called "ipso facto" clauses conditioned upon the debtor's bankruptcy.

There is, however, a limited class of executory contracts with respect to which assumption or assignment cannot be forced on an unwilling party. Under § 365(c), Bankruptcy Code, these include contracts to make a loan or to extend other debt financing or financial accommodation and also "personal service" contracts where

(1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment.

Similarly, under § 365(e)(2), Bankruptcy Code, the unenforceability of contract provisions which modify a debtor party's rights on the filing of bankruptcy

does not apply to an executory contract ..., whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if—

(A)(i) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to the trustee or to an assignee of such contract ..., whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and

(ii) such party does not consent to such assumption or assignment.

■■■ As an initial matter, the court is required to determine the nature of the De-Lucas' interest in D & B Countryside. In the partnership context, it has been held that the interest of a debtor general partner is

comprised of three components: the right to participate in profits, losses, distributions and proceeds of the partnership ("Economic Interest"); the right to participate in the management of the partnership ("Management Interest"); and the ownership share in partnership property as a tenant-in-partnership.

*In re Cardinal Industries, Inc.,* 116 B.R. 964, 970–971 (Bankr.S.D.Ohio 1990). In a limited liability company, members have no direct interest in the company's property,[20] but

---

· tute a material breach excusing performance of the other.
Countryman, Executory Contracts in Bankruptcy, 57 Minn.L.Rev. 439, 450–460 (1973). 2 King, Collier on Bankruptcy, ¶ 365.02, n. 3, p. 365–16.5 (15th ed). *See, Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043 (4th Cir.1985), cert. denied 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (contract is executory if performance is due to some extent on both sides).

**19.** Although § 365(a) refers only to a "trustee," under § 1107, Bankruptcy Code, a debtor in possession has all of the rights, powers, and duties of a trustee, except the right to compensation.

**20.** *See,* § 13.1–1021, Va.Code Ann ("Any estate or interest in property may be acquired in the name of the limited liability company, and title to any estate or interest so acquired vests in the limited liability company."); § 13.1–1034 ("Except as provided in writing in the articles of organization or an operating agreement, a member, regardless of the nature of his or its contribution, has no right to demand and receive any distribution from a limited liability company in any form other than cash."); § 13.1–1038 ("A membership interest in a limited liability company is personal property."); § 13.1–1041 (judgment creditor has right to obtain a charging order against member's interest but "has only

members have an economic interest, referred to in the statute as a "membership interest,"[21] and, in addition, both the managing member and, where the manager cannot or is not authorized to act, all members, have a management interest.

Courts have generally held partnership agreements to be a form of executory contract. *Breeden v. Catron (In re Catron)*, 158 B.R. 624, 626 (Bankr.E.D.Va.1992) (Tice, J.), *aff'd*, 158 B.R. 629 (E.D.Va.1993), *aff'd*, 25 F.3d 1038 (4th Cir.1994). They have split, however, on whether such contracts are of the "personal service" variety which, under § 365(e)(2), Bankruptcy Code, cannot be forced on an unwilling party, or whether, conversely, they are subject to the prohibition on enforceability of ipso facto clauses under § 365(e)(1). *Compare, Catron, supra*, 158 B.R. at 627 ("Fundamentally a partnership is based upon the personal trust and confidence of the partners;" because of this relationship, "the agreement or contract governing the partnership is essentially a contract for personal services, which renders it also nondelegable and nonassumable"),[22] with *Summit Investment and Development Corp. v. LeRoux*, 69 F.3d 608 (1st Cir.1995) (ipso facto termination clause in limited partnership agreement and limited partnership statute unenforceable against debtor general partner).[23] Still other courts have adopted a pragmatic, case by case analysis that looks to the specific partnership in question, and the nature of the debtor's responsibilities, to determine whether the partnership agreement is an executory contract. *In re Antonelli*, 148 B.R. 443, 448 (D.Md.1992) (Motz, J.) (nondebtor party is excused from performance only "if the identity of the debtor is a material condition of the contract when considered in the context of the obligations which remain to be performed under the contract").

In *Catron*, this court and the District Court held that a debtor, as debtor in possession, is "a separate entity from the debtor who entered [into] the contract prepetition."

the rights of an assignee of the interest in the limited liability company.")

**21.** " 'Membership interest' or 'interest' means a member's share of the profits and the losses of the limited liability company and the right to receive distributions of the limited liability company's assets." § 13.1–1002, Va.Code Ann. See § 13.1–1029, Va.Code Ann. ("Sharing of profits and losses") and § 13.1–1030, Va.Code Ann. ("Sharing of distributions").

**22.** Other cases holding that the bankruptcy of a general partner dissolves the partnership or strips the debtor general partner of management rights include *Phillips v. First City, Texas–Tyler, N.A. (In re Phillips)*, 966 F.2d 926 (5th Cir.1992) (partner who was chapter 11 debtor did not have authority to file chapter 11 petition for partnership); *In re Doddy*, 164 B.R. 276 (Bankr. S.D.Ohio 1994) (nondebtor partnership dissolved on chapter 13 filing by debtor general partner); *In re Tip O Texas RV Village*, 87 B.R. 195 (Bankr. M.D.Fla.1988) (debtor general partner had no right to manage four limited partnerships against whom involuntary petition had been filed); *In re Sunset Developers*, 69 B.R. 710 (Bankr.D.Idaho 1987) (debtor general partner had no authority to file involuntary petition against partnership; as debtor in possession, the general partner was a new entity and entitled only to contract profit to which an assignee is entitled, without management or voting rights); *In re Minton Group*, 27 B.R. 385 (Bankr.S.D.N.Y.1983), *aff'd*, 46 B.R. 222 (S.D.N.Y.1985) (chapter 11 filing by general partner dissolved limited partnership and deprived debtor general partner of management authority); *Normandin v. Normandin (In re Normandin)*, 106 B.R. 14 (Bankr.D.Mass.1989) (debtor general partner may not sell partnership assets; provision of state law denying debtor partner the right to control the winding up process not in conflict with Bankruptcy Code).

**23.** Other cases holding that a general partner's bankruptcy filing does not dissolve a partnership or strip the general partner of management rights include *In re Clinton Court*, 160 B.R. 57 (Bankr.E.D.Pa.1993) (debtor partnership not dissolved by prior chapter 11 filing of general partner); *In re Corky Foods Corp.*, 85 B.R. 903 (Bankr.S.D.Fla.1988) (motion to require debtor partner to abandon interest in partnership because of dissolution denied; state statute providing for dissolution held to be invalid ipso facto clause); *In re BC & K Cattle Co.*, 84 B.R. 69 (Bankr.N.D.Tex.1988) (general partner's chapter 11 filing did not deprive him of authority to file involuntary petition against partnership); *In re Rittenhouse Carpet, Inc.*, 56 B.R. 131 (Bankr. E.D.Pa.1985) ("removal of a debtor general partner of a limited partnership may not be predicated merely on the filing of a petition in bankruptcy, notwithstanding provisions of state law to the contrary"); *Quarles House Apts. v. Plunkett (In re Plunkett)*, 23 B.R. 392 (Bankr.E.D.Wis.1982) (debtor general partner's right to manage nondebtor partnership's business and to receive management fee under partnership agreement is property of the estate).

158 B.R. at 627. In so holding, this District has rejected the contrary holding of the leading case of *Cardinal Industries, supra,* 116 B.R. at 981. This aspect of *Catron* has been criticized by other courts, which have noted its apparent inconsistency with the holding of the United States Supreme Court in *National Labor Relations Board v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).[24] *See, e.g., Summit Investment and Development Corp., supra,* 69 F.3d at 610. Since *Cardinal Industries* and the cases which follow it view the debtor in possession as the same entity as the prepetition debtor, they do not reach, in the assumption context, the issue of whether a partnership agreement is a personal service contract.

▆▆▆▆▆▆ Upon careful consideration, this court concludes that the operating agreement governing D & B Countryside is an executory contract, since the object of the agreement—the development of the Parc City Center project—has not yet been accomplished and the parties have on-going duties and responsibilities to bring the project to a successful conclusion.[25] The court further concludes that the nature of those duties and responsibilities are such as to make the contract one for personal services. In *Antonelli, supra,* Judge Motz, while declining to adopt a *per se* rule that would characterize all partnership agreements as personal service contracts, recognized that there were a number of partnership agreements that would fall into that category. For example,

> a reorganization plan could not require that a law firm accept as a partner the assignee of one of their partners who had become bankrupt. The nature of the duties which law partners owe, not only to one another but to their clients, make their

identities material to the very existence of the partnership.

148 B.R. at 448–449. With respect specifically to real estate partnerships, Judge Motz distinguished between "development" projects on the one hand "in which the general partner must administer the planning, construction and leasing of the building," and "matured" projects on the other "that require only routine management and leasing functions." 148 B.R. at 449. In the former, "the identity of a general partner will be critical to the limited partners and to the prospect of a successful investment," while in the latter, "the identity of a general partner is less significant." *Id.* D & B Countryside is a paradigm example of a development project where the identity of the managers is material to very existence of the company. Since the court has concluded that the DeLucas were properly removed as the managers of the company prior to the filing of their chapter 11 petition, the issue of their assuming the management functions specified in the operating agreement is not implicated, but upon their removal they would have had the right and duty to participate in the election of a successor manager, acceptable to all the members, to carry on the management function. Additionally, they would have had the right and duty to vote on any matter with respect to which a manager could not act unilaterally. Particularly in view of the highly questionable conduct of the DeLucas in having allowed a deed of trust to be recorded against the company's property to secure a personal loan and in having siphoned out of the company essentially all of NVRI's $600,000 investment within a week of its having been paid in, and given that the Parc City Centre project is still very much in the development phase, with important decisions to be

---

**24.** "[I]t is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing."

**25.** One of those responsibilities is the contribution of any additional capital needed to bring the project to fruition. Although the operating agreement contains no express obligation for the contribution of additional sums beyond the initial

capitalization of $2,000,000 (which in any event was never fully achieved), the obligation is implied in ¶ 5.1, which, after reciting the initial capitalization amounts, states, "Thereafter, any additional contributions shall be made pro rata by each Member." In a memorandum to the DeLucas dated September 27, 1994, Broyhill acknowledged this responsibility: "I am and will continue to promptly and timely fund my 50% share of the cash requirements to perform and develop the Parc Center project."

made with respect to the sale or lease of parcels and possible further financing (which, as with the current financing, could very well require the personal guarantees of members), there is no way the identity of the DeLucas would not be material to the other members and to the success of the project. Consequently, the court concludes that the provisions of the operating agreement that provide for the dissolution of the company upon a member's bankruptcy filing, with the remaining members having the right to elect to continue the business and to elect a new manager, fall within the exception of § 365(e)(2) and accordingly are not invalid "ipso facto" provisions under § 365(e)(1). It therefore follows that the action taken by Broyhill and NVRI following the DeLucas bankruptcy "confirming" the prepetition election of Broyhill as the new manager was effective under ¶¶ 9.2 of the operating agreement to accomplish the election of Broyhill as the new manager, effective at least as of the date the document was signed. Such action, of course, does not deprive the DeLucas' bankruptcy estate of the economic interest—the right to share in profits, losses, and distributions—the DeLucas have as a result of their 42.5% membership interest. Under § 544(a), Bankruptcy Code, a trustee, and by extension a debtor in possession, has the rights of a lien creditor "who extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien." § 13.1–1041, Va.Code Ann., gives such a creditor the right to obtain a charging order against the member's interest in the company. Such an order confers on the creditor the rights of an assignee of the member's interest, which includes, under § 13.1–1039, Va.Code Ann., the right "to receive ... any share of profits and losses and distributions to which the assignor would be entitled." Thus, the DeLucas' bankruptcy estate will be entitled to any distributions due on account of the DeLucas' membership interest.

## C. The effect of the court's ruling.

The court's conclusion that the DeLucas were properly removed as the managers of D & B Countryside prior to their (and the company's) chapter 11 filing and that Broyhill was properly elected as the successor manager subsequent to such filing has a number of ramifications. First, it would appear to follow that the DeLucas had no authority to file a chapter 11 petition on behalf of D & B Countryside.[26] Whether the petition must or should be dismissed as a result of such lack of authority is an issue not before the court at this time, and the court makes no ruling.[27] Second, since a chapter 11 trustee has been appointed and is currently serving, the ruling that Broyhill was properly elected as the successor manager has no immediate practical effect, since all business decisions are currently being made by the chapter 11 trustee. Since, however, the chapter 11 trustee was ordered appointed in response to vocal creditor complaints about the DeLucas' conduct in managing their various entities, including D & B Countryside, the determination that the DeLucas are not the managers of D & B Countryside *may*— an issue the court expressly does not de-

---

**26.** See, *In re Old Grind Co., Inc.,* 99 B.R. 317 (Bankr.W.D.Va.1989) (Krumm, J.) (Chapter 11 petition dismissed since under Virginia law corporation's president had no authority, solely in his capacity as president, to file on behalf of corporation.); Thomas F. Blakemore, Limited Liability Companies and the Bankruptcy Code, 13 Am.Bankr.Inst.J. 12 (June 1994) (suggesting that unanimous consent of members may be required for bankruptcy filing unless operating agreement clearly confers such authority on manager).

**27.** Although both under the operating agreement and state law the chapter 11 filing by the DeLucas triggered the dissolution of D & B Countryside, such dissolution did not in and of itself make D & B Countryside ineligible to be a chap-

ter 11 debtor. For one thing, the agreement and the statute both permitted the remaining members to vote to continue the company's business. Second, even had they not done so, the company's formal existence would have continued until its business was wound up. *See, Grant v. Bank of Va. (In re 2111 Associates–Chicago),* 580 F.2d 705 (4th Cir.1978) (Partnership continued for purpose of permitting involuntary petition to be filed against it even though only remaining general partner had filed an arrangement proceeding under chapter XII of the Bankruptcy Act); *In re Wine Farms, Inc.,* 94 B.R. 410 (Bankr.W.D.Va. 1988) (under Virginia law, a dissolved corporation may file for chapter 11 relief).

cide—justify the termination of the trustee's appointment.[28] Finally, the court's ruling means that the Joint Plan of Reorganization proposed by the DeLucas in the name of D & B Countryside is not, as a technical matter, the *debtor's* plan with respect to D & B Countryside. At this point, however, there is no exclusive right on the part of the debtor to propose and obtain confirmation of a plan—that right having terminated under § 1121(c)(1), Bankruptcy Code, when the chapter 11 trustee was appointed. Accordingly, any party in interest, including an equity security holder, may file a plan. Consequently, it would appear that the DeLucas, as debtors in possession in their own chapter 11 case, have the right, as the assignees of their own membership interest, to file a plan in the case of D & B Countryside, and the fact that the plan may be improperly labeled as a debtor's plan rather than an equity security holder's plan is of no consequence.

### Conclusion

For the foregoing reasons, which constitute the court's findings of fact and conclusions of law under Fed.R.Bankr.P. 7052, the court determines (1) that the DeLucas were properly removed as the managers of D & B Countryside prior to the filing of their chapter 11 petition and (2) that Broyhill was, subsequent to the DeLucas' chapter 11 filing, properly elected as the successor manager. A separate judgment will be entered consistent with this opinion.

28. "At any time before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court may terminate the trustee's appointment and re-store the debtor to possession and management of the property of the estate and of the operation of the debtor's business." § 1105, Bankruptcy Code.