## In re D.F. ANTONELLI, Jr. and Judith D. Antonelli.

### Civ. No. JFM–92–3286.

United States District Court, D. Maryland.

Dec. 4, 1992.

Roger Frankel, Richard H. Wyron, Swidler & Berlin, Washington, DC, for Antonelli.

Richard P. Schifter, Richard M. Lucas, Michael L. Bernstein, Arnold & Porter, Washington, DC, for the Official Committee of Unsecured Creditors.

Nancy V. Alquist, James C. Olson, Robert A. Weber, Ballard, Spahr, Andrews & Ingersoll, Baltimore, MD, for appellees Gould.

## OPINION

MOTZ, District Judge.

Kingdon Gould, Jr. and Mary T. Gould, partners with Dominic F. Antonelli, Jr., in several real estate ventures, have appealed an order of the Bankruptcy Court approving the confirmation of a plan (the "Plan") for the reorganization of Mr. Antonelli and his wife, Judith. On November 23, 1992, I entered an order staying the Bankruptcy Court's order and required expedited briefing on the merits of the Goulds' appeal.[1]

---

**1.** The FDIC, a creditor, and two other partnerships, 1722 Eye Street Associates Limited Partnership and Pennsylvania Building Associates Limited Partnership, also initially appealed from the Bankruptcy Court's confirmation order. I denied a motion to stay filed by the FDIC

The parties have now submitted extensive memoranda, a hearing has been held and the underlying issues are ripe for decision.

## I.

Mr. Antonelli is a major real estate developer in the Washington D.C. metropolitan area. He began business shortly after World War II, buying and leasing land for use as parking lots in downtown Washington. He eventually became chairman and part owner of PMI Inc., a parking facilities management and operations firm. In addition, by January 1991, he, Mrs. Antonelli and other family members held partnership or direct ownership interests in over 150 real estate projects.

Unfortunately, in 1990 the Antonellis' financial condition became precarious because of a deterioration in the Maryland and D.C. real estate market. On January 17, 1991, bankruptcy proceedings were instituted against them. These proceedings became the largest Chapter 11 case ever filed in the District of Maryland, involving almost 2,000 creditors, claims of over $200 million and assets of over $100 million.

During the first six to nine months after it was instituted, the bankruptcy case was litigated with a fervor that might even have made the advocates in Charles Dickens' *Jarndyce v. Jarndyce* blush. Between January 1991 and August 1991, a number of contested matters were heard by the Bankruptcy Court, ranging from a dispute over Mr. Antonelli's decision to advance $25,000 to a partnership so it could repair a leaking roof to a multi-day hearing on Mr. Antonelli's efforts to take control of projects on which he had guaranteed loans. Further litigation ensued when the Antonellis filed a motion to enlarge their exclusive period to file plans of reorganization. The Bankruptcy Court ultimately granted that motion and gave the Antonellis until August 19, 1991 to formulate their plans.

After the exclusivity litigation was concluded, the Antonellis and a committee of their creditors conducted negotiations for the purpose of determining whether a consensual plan could be developed. These negotiations bore fruit, and in March 1992, the Antonellis and the creditors' committee filed a joint recommended Plan. A disclosure statement relating to the joint Plan was approved by the Bankruptcy Court in May 1992. That statement, along with the Plan, was mailed to all creditors, and a deadline of July 15, 1992 for voting on the Plan was set.

Creditors holding 93% of the unsecured claims voted in favor of the Plan.[2] Hearings on the Plan's confirmation were held in early August 1992. Objections were filed by three creditors and several of Mr. Antonelli's real estate venture partners, including the Goulds. The Bankruptcy Court overruled the objections filed by the creditors. The partners' objections were, however, initially sustained. Thereafter, certain modifications to the Plan were made and on November 19, 1992, the Bankruptcy Court entered an order confirming the Plan. This appeal followed.

## II.

### A.

The Plan provides for the transfer of virtually all of the assets of the Antonellis' joint bankruptcy estate to a liquidating trust. The trustees of the liquidating trust are the seven members of another entity known as the "Plan Committee." Six members of this Committee are financial institutions which are creditors of the Antonellis. Mr. Antonelli is the seventh member. The liquidating trust is to dispose of the assets over a five year period and distribute the proceeds to the creditors of the estate. Daily management of the liquidating trust is to be handled by an asset manager supervised by the Plan Committee. The

---

but its appeal remains pending. A settlement has now been reached between the Eye Street and Pennsylvania Building Associates partnerships and Appellees.

2. The holders of claims totalling over $412 million of the total unsecured claims of $441 million voted in the Plan's favor. The FDIC, which holds a claim valued for voting purposes at $28,000,000, accounted for almost the entire vote against the Plan.

Bankruptcy Court has approved the retention of Baily Realty Services Corporation, the principals of whom have substantial real estate experience, as the asset manager.

Among the property interests transferred to the liquidating trust under the Plan are the economic surplus of various partnership interests held by Mr. Antonelli. The Goulds do not challenge this aspect of the Plan. They do, however, challenge another provision which, while retaining Mr. Antonelli as a general partner in these real estate partnerships, requires him to cast his vote on partnership matters as directed by the Plan Committee. Under the terms of the Plan as finally confirmed by the Bankruptcy Court, an exception to this requirement is provided if Mr. Antonelli believes that to vote as directed by the Plan Committee would violate his fiduciary obligations as a general partner. In that event, he may under the terms of the Plan file a motion with the Bankruptcy Court seeking a determination as to how he should proceed.[3]

### B.

The fundamental question presented on this appeal is whether the provision of the Plan just described violates Section 365(c)(1) of the Bankruptcy Code. Four sections of the Bankruptcy Code and one section of the Uniform Partnership Act (as codified by Maryland and the District of Columbia) are relevant to an analysis of this issue. For ease of reference, I will recite the pertinent portions of these statutes verbatim.

*Bankruptcy Code Section 365(c)(1):*

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment;....

11 U.S.C. § 365(c)(1) (1988).

\* \* \* \* \* \*

*Bankruptcy Code Section 365(f):*

(f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not

---

**3.** The relevant provision (Section 11.1(d)(iii)) of the Plan states as follows:

Mr. Antonelli shall take whatever action in his capacity as a general partner is directed by the Plan Committee and will vote in all actions with respect to such capacity as directed by the Plan Committee (and be fully indemnified by the Liquidating Trust ...); *provided, however,* that, if in his reasonable judgment complying with such request would exceed his powers as a general partner or breach his fiduciary duty, prior to taking any action, Mr. Antonelli shall so notify the Plan Committee of such judgment. If the Plan Committee

disagrees with such judgment it shall notify Mr. Antonelli. In the event that Mr. Antonelli thereafter declines to comply with such request, Mr. Antonelli shall file a motion before the Bankruptcy Court seeking a determination as to whether the compliance with such request would cause Mr. Antonelli to exceed his powers as a general partner or breach his fiduciary duty. Mr. Antonelli shall not be required to take any such action unless the Bankruptcy Court shall determine that the taking of the proposed action by Mr. Antonelli would not exceed Mr. Antonelli's powers as a general partner or breach his fiduciary duty.

there has been a default in such contract or lease.

11 U.S.C. § 365(f) (1988).

\* \* \* \* \* \*

*Bankruptcy Code Section 1123(a)(5)(B):*
(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—(5) provide adequate means for the plan's implementation, such as— (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

11 U.S.C. § 1123(a)(5)(B) (1988).

\* \* \* \* \* \*

*Bankruptcy Code Section 1123(b)(2):*
(b) Subject to subsection (a) of this section, [the aforementioned provision,] a plan may—(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

11 U.S.C. § 1123(b)(2) (1988).

\* \* · \* \* \* \*

*Maryland and District of Columbia Uniform Partnership Acts:*
A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.

Md. Corps. & Ass'ns Code Ann. § 9–504 (Repl. Vol 1985 & 1992 Cum.Supp.1992); D.C.Code Ann. § 41–126 (1992).

## III.

The Goulds' argument is straightforward. They assert that: (1) a general part-nership agreement is an executory contract, (2) under Maryland and District of Columbia partnership law, an assignee of Mr. Antonelli has no right to interfere in the management of the subject partnerships without their consent, (3) the challenged provisions of the Plan constitute a *de facto* assignment of Mr. Antonelli's management rights in the subject partnerships, (4) they have not consented to the assignment, and (5) the challenged provision of the Plan is therefore barred by Section 365(c).

### A.

■ The Antonellis and the creditors ("Appellees") first counter this argument by contending that Section 365(c) does not apply to a transfer of a general partnership interest in a plan of reorganization. They start with the undisputable premise that a partnership interest constitutes property of the debtor's estate within the meaning of bankruptcy law. As such, its transfer can be effected to an entity other than the debtor under Section 1123(a)(5)(B). Moreover, that section provides that a transfer can be made under a plan "notwithstanding any otherwise applicable nonbankruptcy law." Thus, according to Appellees, Section 1123(a)(5)(B) overrides Section 365(c) when assumption or assignment of an executory contract is part of a plan of reorganization.

Appellees' argument is complicated by the fact that Section 1123(a)(5)(B) deals with "property of the estate" generally and that Section 1123(b)(2), which deals specifically with the assumption of executory contracts, makes the assumption of such contracts "subject to Section 365." Moreover, the "notwithstanding any otherwise applicable nonbankruptcy law" clause in Section 1123(a) upon which Appellees rely was added to the Bankruptcy Code merely as a technical amendment in 1984, *see In re Public Service Co. of New Hampshire,* 108 B.R. 854, 865 (Bankr.D.N.H.1989), and was not intended to modify substantive law. *See In re FCX, Inc.,* 853 F.2d 1149, 1154 n. 7 (4th Cir.1988). The legislative history of Section 1123 is also problematic for Appel-

lees since Representative Edwards and Senator Deconcini each stated unambiguously before its enactment that "assumption or rejection of an executory contract under a Plan must comply with Section 365 of Title 11."

Appellees are undeterred by these obstacles in their path. Indeed, they deny that they are obstacles at all. They point out that Section 1123(b)(2) is itself "subject to subsection (a) of ... [Section 1123]" which now contains the "notwithstanding any otherwise applicable nonbankruptcy law" language. They happily accept the proposition that the addition of this clause did not change preexisting law, asserting that whatever conflict may appear to exist between the two sections can be harmonized (in accordance with generally applicable canons of statutory construction) by construing the reference to Section 365 in Section 1123(b)(2) as only applying to *substantive* provisions of Section 365, such as the mandate of Section 365(b)(1) that a default be cured (or that adequate assurance be given that the default will be promptly cured) before an executory contract can be assumed. The references in the legislative history of Section 1123(a) can, according to Appellees, be explained and reconciled in like manner.

### B.

The parties have not cited to me any case in which the arguments just summarized have been articulated (much less resolved). A quandary of equal perplexity, involving the interplay of Sections 365(c) and 365(f), has, however, been addressed with some frequency. *See, e.g., In re Magness,* 972 F.2d 689 (6th Cir.1992); *In re Pioneer Ford Sales, Inc.,* 729 F.2d 27 (1st Cir.1984); *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983).

Section 365(f)(2)(B) appears to authorize a trustee to assign an executory contract, notwithstanding any contrary provision in the contract "or in applicable law," if "adequate assurance of future performance by the assignee ... is provided." Section 365(f) is prefaced, however, by the statement that it applies "except as provided in

subsection (c) of ... [Section 365]." That section in turn, prohibits an assumption or assignment of an executory contract if "applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from ... the trustee or an assignee." What Section 365(f) appears to give, Section 365(c) seems to take away. This apparent contradiction has led some courts to conclude that Section 365(c) is intended to apply only as to "contracts for the performance of non-delegable duties," *see In re Taylor Mfg.,* 6 B.R. 370, 372 (Bankr.N.D.Ga.1980), or to "typical personal service contracts," e.g. ones involving opera singers, painters, authors or football players. *See In re Fastrax, Inc.,* 129 B.R. 274, 278 (Bankr.M.D.Fla.1991); *In re Sunrise Restaurants, Inc.,* 135 B.R. 149, 152 (Bankr.M.D.Fla.1991). Other courts have rejected this approach and have specifically applied Section 365(c) to real estate partnership agreements. *See, e.g. In re Manor Place Development Assoc., L.P.,* 144 B.R. 679 (Bankr.D.N.J.1992); *In re Priestley,* 93 B.R. 253 (Bankr.D.N.M.1988); *In re Harms,* 10 B.R. 817 (Bankr.D.Col.1981).

### IV.

Having outlined the issues, I cannot say with any sense of intellectual honesty that I believe that traditional approaches to legal analysis will lead to a principled conclusion. In my view the reality is that in attempting to accommodate competing policy interests, all of which are of substantial weight, Congress has enacted statutes which impose conflicting mandates and has created a statutory scheme leaving interstices which the courts necessarily must fill on a case by case basis. Under these circumstances I will not ornament my holding with a facade of precedent or references to what I deem to be inconclusive statutory language. Rather, I will simply state that I have concluded that here the Bankruptcy Court correctly found that the Plan properly balances the countervailing interests of expediting bankruptcy proceedings and maximizing the bankruptcy estate, on the one hand, and assuring fairness to non-debtor parties, on the other.

I will assume that Section 1123(a)(5)(B) does not override Section 365(c) and that the latter section does apply in the context of the confirmation of reorganization plans.[4] I will also assume (contrary to the conclusion reached by the Bankruptcy Court) that the provision of the Plan challenged by the Goulds constitutes a transfer of management power prohibited by the partnership law of Maryland and the District of Columbia. Nevertheless, I find that Section 365(c) is not a bar to the confirmation of the Plan.

■ My analysis begins with the recent decision of the Sixth Circuit in *In re Magness*, 972 F.2d 689 (6th Cir.1992). There, the court (in both the majority and the concurring opinions, as I understand them) suggested that a sensible way to reconcile Section 365(f) and Section 365(c) is to read the words "applicable law" in Section 365(f) as applying to laws prohibiting assignments by express mandate or express validation of contractual anti-assignment provisions and to read the same words in Section 365(c) as applying to the underlying common law principle excusing under certain circumstances the non-assigning party from performance even in the absence of an express anti-assignment rule. I do not pretend that this distinction is not somewhat facile. Pure anti-assignment rules are relatively rare, in large part because the law prohibiting assignments has naturally grown in the common law process by litigation of cases in which the non-assigning party seeks to be excused of performance. Nevertheless, the distinction is one which the language of Section 365(f) and 365(c) itself suggests, and it is one which I believe opens the way to a thoughtful and just resolution of the issues.

The provision of the Uniform Partnership Act upon which the Goulds rely in this case clearly constitutes, within the context of the distinction which I am drawing, a rule prohibiting assignment within the meaning of Section 365(f), rather than a rule excusing performance within the meaning of Section 365(c). This, however, does not mean that, the Partnership Act aside, the assignment of Mr. Antonelli's management power is not barred by Section 365(c). That question requires a further inquiry into whether or not the assignment would violate the principle suggested by Section 365(c)(1) itself: that the non-debtor party to a contract is excused from performance if the identity of the debtor is a material condition of the contract when considered in the context of the obligations which remain to be performed under the contract.

This principle clearly brings within the ambit of Section 365(c) the classic "personal services" contracts which all courts agree cannot be assigned under that section. It also covers most cases where contracts are held to be non-assignable because they impose upon the debtor duties which are said to be "non-delegable." Application of the rule, however, calls for a particularized, practical approach rather than a conceptual one to the assignment question. Thus, the question of whether or not management power in a partnership is assignable turns not upon the status which "applicable law" generally accords to partnership agreements but upon the materiality of the identity of the partners to the performance of the obligations remaining to be performed under the partnership in question.

Obviously, a reorganization plan could not require that a law firm accept as a partner the assignee of one of their partners who had become bankrupt. The nature of the duties which law partners owe, not only to one another but to their clients, make their identities material to the very

---

**4.** I note, however, that in *In re FCX, Inc.*, 853 F.2d at 1155, the Fourth Circuit has stated that Section 1123(a)(5) is "an empowering statute" and that "Section 1123(a)(5)(D) then does not simply provide a means to exercise the debtor's prebankruptcy rights, it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with the property of the estate." I do not want to over-state the significance of these statements, particularly the latter, since *FCX* did not involve any consideration of the effect of Section 365(c) and since a different subsection of Section 1123(a)(5) was involved in *FCX* than is involved here. Nevertheless, *FCX* does evidence that the Fourth Circuit recognizes that successful reorganizations sometimes require reasonable adjustment of preexisting contract rights.

existence of the partnership. Real estate partnerships, however, cannot be so strictly categorized. As one commentator has noted, the question of whether or not interests (including the exercise of management power) in a real estate partnership should be assignable under Section 365(c) properly depends upon the stage that the real estate project has reached and the substantiality of the duties which the partners must continue to perform.

Many different types of partnerships and many different types of general partners exist. In certain circumstances, the identity of a general partner will be critical to the limited partners and to the prospects for a successful investment. Examples of such circumstances include: (1) a real estate development partnership in which the general partner must administer the planning, construction and leasing of a building; (2) an investment partnership in which the general partner is to identify and evaluate investments of the partnership; and (3) any partnership in which the general partner is required to contribute additional capital to the partnership and, indeed, may have control over the issuance of capital calls to all partners. Similarly, the identity of each general partner is significant in a general partnership comprised of professional persons, such as lawyers or accountants.

On the other hand, partnerships exist in which the identity of a general partner is less significant. These may include (1) *real estate partnerships owning matured projects that require only routine management and leasing functions* and (2) certain large syndication operations that administer a network of separate partnerships. In these cases, it is arguable that another organization with sufficient resources could take over the work of the original general partner without material detriment to the limited partner investors....

In circumstances in which the identity of the general partner is not critical to the partnership, and the trustee desires to assume, or perhaps assume and assign the agreement, the nondebtor partners have a less compelling argument concerning the continuation of the debtor-general partner or the selection of a new general partner. In such instances, the nondebtor partners should not be adversely affected by an assumption or assignment transaction, whereas the debtor and its estate may realize substantial benefits therefrom.

*Collier Real Estate Transactions and the Bankruptcy Code* ¶ 4.07[1] at 4–72 to 4–72.1 (1992) (emphasis added).

In the present case it is undisputed that the partnerships in which Mr. Antonelli and the Goulds are partners involve "matured" projects, specifically completed office buildings. In effect, Mr. Antonelli and his partners simply share real estate investments. Mr. Antonelli is not the sole general partner in any of the partnerships, and the daily management of the office buildings is handled by a property management firm retained by the partnership. Of course, Mr. Antonelli's continuing advice on such questions as building maintenance, renovation and tenant occupancy is quite valuable. However, nothing in the Plan deprives Mr. Antonelli's partners of such advice. Mr. Antonelli is a member of the Plan Committee who will be overseeing his partnership interests, and the Goulds have not suggested any way in which on matters of real estate management their interests diverge from those of Mr. Antonelli or the Plan Committee itself.

The only area of potential conflict to which the Goulds point involves financial decision-making. Specifically, they assert that a dispute has already arisen between them and the creditors as to whether or not there should be a restructuring of the long-term financing for one of the projects. On such issues the conflict may be quite real. Indeed, presumably it is precisely because such conflicts might develop that the creditors wish to be able to control Mr. Antonelli's vote as a general partner. However, if the Plan Committee were to direct Mr. Antonelli to cast a vote so disfavorable to the interest of the partnership as a whole as to violate his fiduciary duty, under the terms of the Plan its action would be subject to challenge before the Bankruptcy Court.

Moreover, it would face potential liability to Mr. Antonelli's other partners.

In any event, as the Bankruptcy Court astutely noted in confirming the Plan, "each … [partner] brings to the partnership his or her own agenda. Sometimes that agenda is controlled in part by family problems, sometimes by tax considerations, sometimes by cash needs and sometimes because of health considerations and sometimes because of estate planning." Here, Mr. Antonelli's economic fortunes have changed dramatically since the time that he entered into the partnership agreements with the Goulds. However, the Goulds could not reasonably anticipate that Mr. Antonelli is immune from the vicissitudes of life. What they could reasonably anticipate was that Mr. Antonelli would bring his expertise on real estate development and management matters to the affairs of the partnerships. He has done so in the past and, under the terms of the Plan, will continue to do so in the future.

## V.

One final issue needs to be addressed. My reasoning in affirming the Bankruptcy Court differs slightly from that which the Bankruptcy Court followed in confirming the Plan. Since (unlike the Bankruptcy Court) I accept the Goulds' contention that the challenged provision of the Plan does violate the partnership laws of Maryland and the District of Columbia, in order for the Plan to be upheld, a finding must be made under Section 365(f)(2)(B) that there is adequate assurance that the Plan Committee will perform its duties under the partnership agreement in the future. The Bankruptcy Court did not expressly make that finding since it found that the restrictions upon the Plan Committee's power to control Mr. Antonelli's vote as a general partner are sufficient to uphold the assignment of that power under Maryland and District of Columbia law. That finding itself is, however, tantamount to a finding on the "adequate assurance of future performance" issue, and a remand of the case to the Bankruptcy Court is therefore unnecessary.