In re David SCHICK, Venture Mortgage Corp., and A & D Trading Group, L.L.C., Debtors.

In re Venture Mortgage Fund, L.P., Debtor.

Bankruptcy Nos. 96 B 42902(SMB), 96 B 43969(SMB), 96 B 46282(SMB) and 96 B 45033(SMB).

United States Bankruptcy Court, S.D. New York.

June 18, 1999.

320

Parker Chapin Flattau & Klimpl, LLP, New York City, Lee W. Stremba, of counsel, for Aurora Cassirer, as Trustee.

Curtis, Mallet–Prevost, Colt & Mosle, New York City, Steven J. Reisman, of counsel, for John F. Schmutz, as Trustee.

Kramer Levin Naftalis & Frankel, LLP, New York City, Kenneth H. Eckstein, Philip Bentley, Robert T. Schmidt, of counsel, for Objecting Partners.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Stephen J. Shimshak, Robert D. Drain, Dana S. Safran, of counsel, for Dears Corp.

## MEMORANDUM DECISION AND ORDER REGARDING OBJECTION TO PROPOSED SALE OF LIMITED PARTNER INTERESTS IN 500 WEST END AVENUE OWNERS, L.P.

STUART M. BERNSTEIN,
Bankruptcy Judge.

The estates of David Schick ("Schick") and Venture Mortgage Fund, L.P. ("VMFLP") own a combined 73.5% limited partner interest in 500 West End Avenue Owners, L.P. (the "Partnership"). The trustees of these estates propose to assume and assign their rights and obligations under the partnership agreement (the "Agreement") to Dears Corp. ("Dears"). A condition of the sale requires that Dears be admitted as a limited partner, with or without the other partners' consent. The general partner and remaining limited partners (collectively, the "Objectants") have objected to the condition, and refuse to consent to Dears' admission.

I conclude that the estates may sell their economic interests to Dears. They cannot, however, force the Objectants to admit Dears as a partner, unless the general partner has withheld its consent to Dears' admission in bad faith.[1] I do not reach the issue of what specific legal rights and obligations can be assigned and delegated to Dears consistent with New York's version of the Revised Limited Partnership Act, N.Y. Partnership L. §§ 121–101, *et seq.* (McKinney Supp.1999) (the "Act") and the Bankruptcy Code.

### BACKGROUND

The Partnership was created in March 1994 to acquire an apartment building on Manhattan's Upper West Side. The Agreement was signed by a single general partner and four limited partners, including VMFLP.[2] The Agreement sets forth each partner's "Residual Interest," which determines the right to share in profits, losses and distributions. (*See* Agreement ¶¶ 5(r), 7(a), 8.) The management of the Partnership is vested exclusively in the general partner, (*see id.,* ¶ 9), who may be removed for cause by partners holding 90% of the partnership interests. (*See id.,* ¶ 11.)

The Agreement limits a partner's ability to transfer his interest. It states:

> Except as otherwise provided in this Article 12, a Partner shall not assign . . . his interest in the Partnership or any part thereof, without both (a) the consent of the General Partner which

---

1. The decision focuses solely on the general partner's consent because without it, the terms of the Agreement block the transfer. The Agreement also requires that partners holding 60% of the total partnership interests consent, but the estates control more than the amount necessary for partner approval.

2. By order of this Court dated April 14, 1998, VMFLP's 65% interest was evenly divided between the Schick and VMFLP estates. In addition, the Schick estate owns an 8.5% limited partner interest, acquired upon the dissolution of Venture Realty Group, Ltd., one of the original limited partners.

consent may be granted or withheld in the absolute discretion of the General Partner and (b) the consent of partners holding, in the aggregate, sixty (60%) percent in interest of all partnership interests. Any actual attempt at assignment ... without such consents shall be void and shall not bind the parties.

(*Id.*, ¶ 12(a)(i).) The consent provision presents an obstacle to the trustees' efforts to sell the estates' limited partner interests. Dears has agreed to pay $6.2 million, all cash, but the sale contract imposes the following condition to closing:

the Partnership shall have consented in writing to the Purchaser becoming a limited partner of the Partnership, or the Bankruptcy Court shall have incorporated in the Sale Order ... provisions ... providing that the Purchaser shall upon the Closing become a limited partner of the Partnership and that Purchaser shall be entitled to have and to exercise all of the rights of Sellers in respect of the Partnership Interest.

(*Joint Application For: (A) An Order to Show Cause [Etc.]*, dated Apr. 9, 1999, Exhibit A, ¶ 7.) The general partner has refused to consent to Dears' admission as a substitute limited partner.

The trustees have filed an application to approve this transaction under 11 U.S.C. § 363. The Objectants initially point out that the application should have been filed under section 365, which, they next argue, precludes the assumption and assignment of the type of interest that the trustees are attempting to transfer. The Objectants concede that the estates can sell their "economic interests" in the Partnership. (*See Reply of West Ventures Inc. [Etc.]*, dated June 2, 1999 ("*Objectants' Reply*"), at 3.) They argue, however, that they cannot use section 365 to force the Objectants to accept Dears as a substitute limited

partner in accordance with the condition stated in the sale contract.

## DISCUSSION

### A. Relevant Bankruptcy Provisions

■ The parties agree that the partnership agreement is an executory contract. (*Compare Joint Memorandum of Law in Further Support of the Trustees' Joint Application [Etc.]*, dated May 21, 1999, at 13 ("*Joint Mem.*") with Objection of West Ventures, Inc. [Etc.]*, dated May 5, 1999, at 6.) Accordingly, they focus on the limitations on assumption and assignment contained in 11 U.S.C. § 365, and in particular, the interplay between sections 365(c)(1) and 365(f).

■ In order to assign the Agreement, the trustees must first assume it. 11 U.S.C. § 365(f)(2)(A).[3] Section 365(f)(1) states the general rule regarding restrictions on assignment:

Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection. . . .

Under section 365(f), therefore, the trustees may assume and assign the Agreement, notwithstanding a restriction on assignment contained in the partnership agreement or applicable law, unless section 365(c) precludes it. The latter section states in relevant part:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

---

**3.** The statute also places other conditions on assignment (curing defaults, giving adequate assurance of future performance). *See* 11 U.S.C. § 365(f)(2)(B). Neither party has suggested that these other conditions are relevant, or if they are, that they cannot be met. However, the Objectants' have reserved their rights on this issue.

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment.

The use of "applicable law" in both provisions yields an apparent inconsistency—section 365(f) seems to give what section 365(c) then takes away. The courts have resolved this dilemma by ascribing different meanings to the phrase "applicable law" appearing in each subparagraph. Under section 365(f), "applicable law" refers to general restrictions on assignment, whereas the same phrase, appearing in section 365(c)(1), refers more specifically to nonbankruptcy law that excuses the nondebtor from accepting performance from or rendering performance to anyone other than the debtor. *See, e.g., In re Catapult Entertainment, Inc.,* 165 F.3d 747, 752 (9th Cir.), *petition for cert. filed,* 67 U.S.L.W. 3749 (U.S. May 28, 1999) (No. 98–1915); *City of Jamestown, Tenn. v. James Cable Partners, L.P. (In re James Cable Partners, L.P.),* 27 F.3d 534, 538 (11th Cir.1994); *Rieser v. Dayton Country Club Co. (In re Magness),* 972 F.2d 689, 695–96 (6th Cir.1992).[4]

■■ In other words, section 365(c)(1) is concerned with non-assignable rights and non-delegable duties under non-bankruptcy law. *See In re Magness,* 972 F.2d at 699 (Guy, J., concurring). Generally, a right is not assignable if assignment would materially change the duty of the obligor,

increase his burden or risk or impair the chance of receiving a return performance or reduce its value. John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 18–10, at 735 (3rd ed. 1987) (*"Calamari & Perillo"*); Restatement (Second) of Contracts § 317(2)(a) (1981); U.C.C. § 2–210(2). A duty is not delegable if the obligee has relied on the obligor's "personality" (*i.e.,* his honesty, skill, reputation, character, ability, wisdom or taste), the duty is based upon a close personal relationship or the obligor has promised to act in good faith or use his best efforts. *Calamari & Perillo* § 18–28, at 760–61; *see* U.C.C. § 2–210 (absent contrary agreement, an obligor may delegate a duty "unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract"). Faced with a state law restricting assignment (contractual restrictions are immaterial under § 365(c)), a court must inquire into its rationale and uphold the restriction under section 365(c) if the identity of the contracting party is material to the agreement. *In re Catapult Entertainment, Inc.,* 165 F.3d at 752.

### B. The Partnership Law

■■ As this case concerns statutory restrictions on the assignment[5] of limited partnership interests, we turn to the relevant partnership law. Section 121–101(m) of the Act defines a "partnership interest" to mean the partner's share of profits and losses and his right to receive distributions. Subject to contrary contractual restrictions (which are immaterial under section 365(c)), a partnership interest is assignable. Act, § 121–702(a)(1). An assignment does not, however, entitle the

---

4. In *In re Pioneer Ford Sales, Inc.,* 729 F.2d 27 (1st Cir.1984), the Court offered a different distinction: section 365(c)(1) refers to state laws that prohibit assignment whether or not the contract is silent, while section 365(f) proscribes state laws that enforce contract provisions prohibiting assignments. *Id.* at 29. The distinction has been criticized as unsupportable in light of the statutory language.

*See In re Magness,* 972 F.2d at 695 (majority opinion) and 699 (Guy, J., concurring); 1 David G. Epstein, Steve H. Nickles & James J. White, *Bankruptcy* § 5–16, at 477 (1992).

5. Unless otherwise stated, references to "assignment" include delegation.

assignee to become or to exercise the rights of a partner. *Id.*, § 121–702(a)(2); *see id.*, § 121–704(a) (explaining how the assignee of a limited partner interest may become a partner).[6] Rather, it only entitles the assignee to receive distributions and allocations of profits and losses. *Id.* § 121–702(a)(3); *accord In re Wilmot*, 244 A.D.2d 980, 665 N.Y.S.2d 783, 784 (N.Y.App.Div.1997).

■■■ The statutory proscription barring non-consensual assignments of membership in the partnership is based upon the principle of *delectus personarum* (or *delectus personae*), the choice of person. "[A]t the heart of the partnership concept is the principle that partners may choose with whom they wish to be associated." *Gelder Med. Group v. Webber*, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573, 577 (1977); *accord Dawson v. White & Case*, 88 N.Y.2d 666, 649 N.Y.S.2d 364, 672 N.E.2d 589, 591–92 (1996); *Levy v. Nassau Queens Med. Group*, 102 A.D.2d 845, 476 N.Y.S.2d 613, 614 (N.Y.App.Div.1984). A partnership is often an intimate business relationship likened to a marriage or a family. Lawrence J. La Sala, *Partner Bankruptcy and Partnership Dissolution: Protecting the Terms of the Contract and Ensuring Predictability*, 59 Fordham L.Rev. 619, 637–38 (1991); *see In re Sovereign Group, 1984–21 Ltd.*, 88 B.R. 325, 329 (Bankr.D.Colo.1988). The assignment of economic rights does not violate the principle of *delectus personarum*, "but it would be violated by the admission of a new speaking and voting member into the closely knit arrangement that typifies the general partnership." I Alan R. Bromberg & Larry E. Ribstein, *Bromberg & Ribstein on Partnership* § 3.05(c)(4), at 3:86 (1999) ("*Bromberg & Ribstein*").

■■■ The right to choose associates in a general partnership is understandably important. General partners can create partnership liabilities, they share equally in profits in lieu of compensation and regardless of the amount they work, they participate equally in the management and conduct of the business, and they are personally liable for partnership debts. II *Bromberg & Ribstein* § 6.03(d), at 6:74. The principle of *delectus personarum* arguably has less significance in the case of limited partners, III *Bromberg & Ribstein* § 12.01(b), at 12:9, and the statutory restrictions on assignment may be more important for income tax rather than personal reasons. *See id.*, § 12.22(f), at 12:237–39.

Nevertheless, the law governing limited partnerships has never abandoned the principle of *delectus personarum*. The restriction on the transfer of membership has been part of the limited partnership laws since the promulgation of the original Uniform Limited Partnership Act in 1916, *see* Unif. Limited Partnership Act § 19(3), 6A U.L.A. 397 (1995), and as noted, continues under the revised act. Accordingly, *delectus personarum* still provides the underlying rationale for restricting the admission of new or substitute limited partners.

## C. The Proposed Transfer of the Estates' Partnership Status

■■■ Subject to the later discussion of bad faith, I conclude that the trustees cannot compel the assignment of the estates' status as limited partners over the objection of the general partner. Initially, the estates' membership in the Partnership is not an interest in property, or a right or a duty, that can be assumed and assigned.

---

**6.** The statutory provisions relating to the admission of substitute limited partners do not, as Dears insists, "merely give effect to the terms of limited partnership agreements." (*Dears Corp.'s Memorandum of Law [Etc.]*, dated May 21, 1999, at 13.) Rather, they create default rules that the partners can override in their agreement. *Cf. In re Hagerstown Fiber Ltd. Partnership*, No. 98 B 41988, 1998 WL 538607, at *6 and n. 11 (Bankr. S.D.N.Y. Aug. 24, 1998) (discussing Maryland limited partnership law). In the absence of an override provision, the assignee of a limited partnership interest does not become a limited partner unless all of the other partners consent in writing.

The Act defines the partnership interest to exclude membership. Similarly, the Agreement does not confer the right to become a partner—the partners signed the Agreement as partners pursuant to a separate understanding. The Agreement merely sets out their rights and obligations.

■ More important, section 365(c)(1) prevents the assignment of partnership membership to Dears unless the other partners agree to admit Dears as a substitute limited partner pursuant to the Agreement. As stated, the distinction drawn in the partnership law between the partner's economic rights and his membership in the partnership is based upon the principle of *delectus personarum. Temple v. White Lakes Plaza Assocs., Ltd.,* 15 Kan.App.2d 771, 816 P.2d 399, 405 (1991); *see Rivlin v. Levine,* 195 Cal.App.2d 13, 15 Cal.Rptr. 587, 592 (1961); I *Bromberg & Ribstein* § 3.05(c)(4), at 3:86. The identity of any partner is material to the other partners, and the right to choose one's partners is a fundamental tenet of partnership law. Thus, the trustees cannot force the Objectants to accept substitute "performance" from or render performance to a stranger.

On this latter point, the trustees and Dears suggest that the principle of *delectus personarum* should have no application to the modern limited partnership. Limited partners, they argue, are similar to shareholders in a corporation. Shares and shareholder status are freely transferable, and they reason that the same rule should apply to the trustees' interests in the Partnership.

While it may sometimes be difficult to justify a distinction between the nature of the rights of limited partners and shareholders, it is beside the point. First, the law does not distinguish between limited partnerships based on size or type of business. Second, the parties originally chose to structure their vehicle as a limited partnership and not as a corporation. Although the record is silent, I assume they perceived tax or other advantages from their choice.

Third, the analogy to shareholders is not apt in the present circumstances. The Partnership includes only a handful of partners; this is not a case in which the Partnership has sold numerous limited partnership interests to numerous investors whose identities may be unimportant. The Partnership was apparently put together by two groups of business associates and personal acquaintances. (*Objectants' Reply* at 12–13.) The Agreement contains restrictions on transfer and admission, common to many limited partnership agreements, presumably to keep it that way. It is true that the Objectants inherited the estates as their partners, but that was not by choice and does not signal a reason to disregard the underlying principle of *delectus personarum.*

Finally, the case law discussed by the parties does not support the forced admission of Dears into the Partnership. To the contrary, the limited case law addressing this specific issue confirms that membership status is not assignable based upon the principle of *delectus personarum, see In re Priestley,* 93 B.R. 253, 257 n. 4 (Bankr.D.N.M.1988); *Temple v. White Lakes Plaza Assocs., Ltd.,* 816 P.2d at 406, and hence, is subject to the restriction in 11 U.S.C. § 365(c)(1). *See In re Priestley,* 93 B.R. at 260. In this regard, *In re D.F. Antonelli,* 148 B.R. 443 (D.Md.1992), *aff'd in unpublished op.,* 4 F.3d 984, 1993 WL 321584 (4th Cir.1993), the trustees' and Dears' principal authority, is inapposite. There, the chapter 11 debtor, a real estate developer, was a general partner in various partnerships. Under his plan, he transferred his partnership interests to a voting trust to be controlled by a Plan Committee consisting of six creditors and the debtor. 148 B.R. at 444–45. The debtor continued as a general partner, but had to vote on partnership matters as directed by the Plan Committee unless the debtor believed that the vote would violate his fiduciary duties as general partner.

*Id.* at 445. The objectants argued that the voting restriction constituted an improper transfer of the debtor's management rights—which the court assumed to be true for the purpose of its decision—and hence, was barred by section 365(c)(1). *See id.* at 448.

Overruling the objection, the court initially determined that the applicability of section 365(c) must be decided on a case-by-case basis,[7] and prevents an assignment only if the debtor's *remaining* obligations are the type that cannot be assigned. *Id.* The court then concluded that the debtor's identity was not critical. The partnerships involved "mature" real estate projects requiring few significant management decisions by the debtor. The debtor had other general partners, and non-partner managers ran the properties. Moreover, the debtor could continue to render advice. Finally, there was no evidence that the interests of the objecting partners diverged from those of the debtor or the Plan Committee. *Id.* at 449. The only area of potential conflict concerned financial decision making. The debtor, however, had the express right to vote his fiduciary "conscience," and the Plan Committee could face liability to the debtor's other partners. *Id.* at 449–50.

In *Antonelli*, the debtor did not assign his membership in the partnerships—he remained a general partner. Thus, the issue of whether an assignee could become a limited partner over the objection of the other partners was not before the *Antonelli* court. In addition, the court approved the assumption and assignment, in part, because the debtor remained a general partner. His overriding fiduciary obligations restricted the Plan Committee's influence in the critical area of financial decision making. Here, the trustees propose to cede their rights and duties to Dears. Finally, the Partnership is not a "mature" real estate partnership in the sense used by the *Antonelli* court. The trustees' own submissions indicate that the present dispute had its origin in their desire to sell the property and the general partner's desire to hold it. The future of the property is unresolved and will necessarily be the subject of future decision making.

■ Accordingly, I conclude, subject to the discussion in the next section, that while the trustees can assume and assign their various economic rights to Dears, they cannot force the Objectants to admit Dears as their substitute limited partner against their will. I do not address the separate question of which statutory and contract rights will pass to Dears should an assignment confined to economic rights go forward. There is no actual case or controversy regarding the exercise of specific rights or the performance of specific obligations, and any decision would be purely advisory. Moreover, should the transaction close, disputes between the Objectants and Dears (or another assignee) are not the concern of this Court.

### D. The General Partner's "Absolute Discretion" to Withhold Consent

■ Having concluded that consent is necessary, I must consider whether the general partner has breached the Agreement or otherwise wrongfully withheld consent to the admission of Dears. We may take as common ground that a general partner owes fiduciary duties to the partnership and the limited partners. *Riviera Congress Assocs. v. Yassky*, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876, 879 (1966); *Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 277 N.Y.S.2d 377, 223 N.E.2d 869, 873 (1966). These duties include good faith, fairness and loyalty. *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1078 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); IV *Bromberg & Ribstein*

---

**7.** The Objectants in this case challenge the case-by-case approach. In light of the disposi-  tion of this matter, I need not reach this issue.

§ 16.07(a)(2), at 16:88–89. Here, the parties also incorporated the general partner's fiduciary duties in their Agreement. (Agreement ¶ 9(d).) In addition, New York law implies a covenant of good faith and fair dealing in every contract, *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 923 n. 8 (2d Cir.1977); *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933), and this includes partnership agreements. *Gelder Med. Group v. Webber*, 394 N.Y.S.2d 867, 363 N.E.2d at 577; *accord Ehrlich v. Howe*, 848 F.Supp. 482, 491 (S.D.N.Y.1994); *Reid v. Bickel & Brewer*, No. 89 Civ. 5777, 1990 WL 129199, at *4 (S.D.N.Y. Sept. 4, 1990).

■■■■ The covenant of good faith and the fiduciary duty of good faith are sometimes hard to separate and often become intertwined in the decisions. *See Lawlis v. Kightlinger & Gray*, 562 N.E.2d 435, 441 (Ind.Ct.App.1990); II *Bromberg & Ribstein* § 6.07(a)(2), at 6:111. Fiduciary duties, however, generally relate to the business aspects of the partnership. They include proscriptions against self-dealing, use of partnership property, usurping partnership opportunities, competing with the partnership and in some cases, mismanagement. *See IV Bromberg & Ribstein* § 16.07(b)–(e), at 16:102–28; *Lawlis v. Kightlinger & Gray*, 562 N.E.2d at 441–42; *Holman v. Coie*, 11 Wash.App. 195, 522 P.2d 515, 523–24 (1974), *cert. denied*, 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975). The general partner also owes fiduciary duties when dealing with the in- dividual partners. These include limited duties relating to transactions that affect the partner's purchase or sale of an interest in the partnership, or his withdrawal or expulsion from the firm. *See IV Bromberg & Ribstein* § 16.07(g), at 16:129.

■■■■ The implied covenant of good faith, on the other hand, is a rule of interpretation rather than a separate obligation. *See II Bromberg & Ribstein* § 6.07(a)(2), at 6:111. Its aim is to effectuate the objectively reasonable expectations of the parties. *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. Partnership*, 840 F.Supp. 770, 776 (D.Or.1993) (interpreting Oregon law), *aff'd in part and rev'd in part on other grounds*, 76 F.3d 1003 (9th Cir.1996); *accord II Bromberg & Ribstein on Partnership* § 6.07(a)(2), at 6:112. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with justified expectations of the other party." Restatement (Second) of Contracts § 205, cmt. a (1981). Evasions and subterfuges violate the covenant even though the obligor believes himself to be acting within his rights. *Id.*, § 205, cmt. d.[8]

■■■ Here, the Agreement gives the general partner the "absolute discretion" to consent or withhold consent to the admission of a substitute limited partner. "Absolute discretion," however, does not necessarily mean what it suggests, or negate the implied covenant of good faith and fair dealing. *See Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d at 923 n. 8. In *Tymshare Inc. v. Covell*, 727

---

8. Despite the distinction, many partnership cases interpret the covenant of good faith to preclude the type of conduct proscribed by the fiduciary duty of good faith. Thus, contractual bad faith has been deemed to include an "evil, malevolent or predatory purpose," *Gelder Med. Group v. Webber*, 394 N.Y.S.2d 867, 363 N.E.2d at 577, or the desire to gain a financial advantage over or appropriate benefits from the partner's departure. *Reid v. Bickel & Brewer*, 1990 WL 129199, at *5; *Levy v. Nassau Queens Med. Group*, 476

N.Y.S.2d at 614; *Fitzgerald v. Cantor*, No. Civ. A. 16297–NC, 1999 WL 182571, at *1 (Del. Ch. Mar. 23, 1999) (general partner with sole and absolute discretion under partnership agreement to withhold consent to transfer of shares in corporate limited partner cannot withhold consent out of self-interest, to advance the interests of other partners that are unrelated to the partnership, or in violation of the duty of loyalty owed equally to all limited partners and their common interests in the partnership).

F.2d 1145 (D.C.Cir.1984), the plaintiff worked as a salesman for the defendant. He earned commissions by making sales in excess of a quota established by the defendant. The defendant's compensation plan authorized it to change the plan at its "sole discretion." *Id.* at 1148. The defendant retroactively modified the plan, and as a result, the plaintiff lost substantial compensation, resulting in the lawsuit. *Id.* at 1149.

Then–Circuit Judge Scalia initially concluded that the defendant had the power to make retroactive modifications to the quota plan. *Id.* at 1150–51. It did not follow, however, that it had the unfettered right to do so, despite the unlimited discretion granted under the compensation plan. Rather, under the implied covenant of good faith (or the related doctrine of "implied limitations"), "the object of our inquiry is whether it was reasonably understood by the parties to this contract that there were at least certain purposes for which the expressly conferred power to adjust quotas could not be employed." *Id.* at 1153.

> "What the intent of the parties was in making the contract must control; it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant." [Citation omitted.] But the trick is to tell when a contract has been so drawn—and surely the mere recitation of an express power is not always the test.

*Id.; accord W. Alton Jones Found. v. Chevron U.S.A., Inc. (In re Gulf Oil/Cities Serv. Tender Offer Litigation),* 725 F.Supp. 712, 736 (S.D.N.Y.1989). Accordingly, an express power will preclude the requirement of good faith "if the power leaves absolute and uncontrolled discretion to exercise the power in one of the parties and if the other party can have no reasonable expectation of any implied protection from the power's exercise other than pro-

cedural notice." *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1268 (10th Cir.1988); *accord White Stone Partners, L.P. v. Piper Jaffray Cos.,* 978 F.Supp. 878, 883 (D.Minn.1997); *see Tymshare, Inc. v. Covell,* 727 F.2d at 1154 (concluding that "it is simply not likely that the parties had in mind a power quite as absolute as appellant suggests").

The crux of the trustees' argument is that the general partner has exercised its "absolute discretion" for an improper motive, and the reasons it offers are a subterfuge.[9] They contend that the general partner is withholding consent to exert leverage and acquire the trustees' interests at a lower price. (*See Joint Mem.,* at 29–31.) They allege that the general partner has, on prior occasions, tried to extort money from the estates, (*id.,* at 4), and buy the estates' interests. On the second point, the general partner previously made an all cash offer of $7 million for the estates' interests. The trustees accepted the offer, subject to a written memorialization, but the proposed transaction died as the cash component of the offer eventually dwindled to zero. (*Id.* at 5.) During the negotiations, however, the general partner delivered a signed purchase agreement containing its advance consent to admit, as a substitute limited partner, anyone making a higher and better offer approved by the Court. (*Joint Mem.* at 30.) The trustees point to this earlier agreement as evidence that the general partner does not care about the identity of the substitute limited partner.

The Objectants, in turn, rely on the general partner's "absolute discretion," and dispute the trustees' allegations and the charge of bad faith. Initially, I reject their implication that the bad faith exercise of the general partner's absolute discretion is unreviewable as a matter of law; it is only absolute if the parties intended it to be. However, they also intimate two specific reasons for the general partner's refusal to consent. First, the consent pro-

9. Neither side has submitted affidavits or pleadings, and their positions have been culled from the memoranda and other submissions.

vision in the Agreement was intended to maintain the balance between the two "factions" that joined together to form the Partnership. (*See Objectants' Reply*, at 12–13.) Their concern is that if Dears is admitted, it will upset the balance and control a 73.5% vote of limited partner interests. According to the Objectants, the general partner gave its advance consent to the admission of a successful bidder during earlier negotiations as part of an overall settlement and under the threat of litigation. (*Id.* at 19–20.)

Second, the Objectants hold that the proposed assignee is unacceptable. The principal of Dears is Adam Katz. The Objectants know him only by reputation. They point to uncomplimentary press reports describing abusive and harassing tactics directed at tenants in buildings Katz controlled, (*id.*, at 19, Exhibits B, C.), and past legal problems with the New York Attorney General concerning a cooperative conversion. *Id.* at 18–19; *see Attorney General v. Katz*, 81 A.D.2d 554, 438 N.Y.S.2d 327 (N.Y.App.Div.1981), *aff'd*, 55 N.Y.2d 1015, 449 N.Y.S.2d 476, 434 N.E.2d 712 (1982).[10] They are concerned that if they decide to convert the building to cooperative ownership, Katz's affiliation with the Partnership may hurt the success of a conversion plan. (*Objectants' Reply* at 18–19.)

In substance, the trustees charge that the general partner's reason is pretextual, and that the general partner (and possibly the other limited partners) are simply trying to force the trustees to sell their interests on the cheap. Implicitly, the trustees also maintain that the partners did not intend that the general partner could refuse to consent, even in its absolute discretion, to accomplish this end. These allegations state a claim for breach

of the implied covenant of good faith and fair dealing. *See White Stone Partners, L.P. v. Piper Jaffray Cos.*, 978 F.Supp. at 880.[11] Accordingly, the matter requires an evidentiary hearing at which the trustees will bear the burden of proof. *See Fitzgerald v. Cantor*, 1999 WL 182571, at *1; *Gelder Med. Group v.. Webber*, 394 N.Y.S.2d 867, 363 N.E.2d at 577.

So ordered.

---

**10.** The press reports and litigation with the Attorney General primarily if not exclusively concern Mr. Katz's father, Curtis Katz.

**11.** In light of this determination, I have not considered the separate issue of whether the refusal to consent also breaches the contractual or extra-contractual fiduciary duties

owed by the general partner to the estates. The parties have not distinguished between the breach of fiduciary duties and the breach of the implied covenant in their submissions, and it is not clear that the fiduciary duties of good faith and fairness, if applicable to the specific issue, add anything to its resolution.