**In re GARRISON–ASHBURN, L.C., Debtor.**

**No. 00–11478–SSM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Aug. 25, 2000.

Roy D. Bradley, Bradley Law Firm, P.C., Madison, VA, for appellant.

Robert O. Tyler, Tyler, Bartl, Burke & Albert, P.L.C., Alexandria, VA, for appellee.

## *MEMORANDUM OPINION*

ROBERT G. MAYER, Bankruptcy Judge.

THIS CASE is before the court on the motion of Stephen H. Chapman for reconsideration of the order authorizing the sale of the debtor's real estate. While the motion does not state which rule it is filed under, it was filed within ten days after the entry of the order and seeks a substantive alteration of the court's ruling. It will, therefore, be treated as a motion to alter or amend under F.R.BANKR.P. 9023 which incorporates F.R.CIV.P. 59(e).[1]

---

1. The facts and legal contentions are adequately presented in the motion. In light of the matters raised in the motion and at the

The sale approved by the court involved two parcels of land: one owned by the debtor and the second by a sister company, Garrison–Woods, L.C. Both are Virginia limited liability companies. The prospective purchaser submitted a contract conditioned upon acquiring both parcels. The court held an evidentiary hearing which included, *inter alia,* testimony on the issue of whether Garrison–Woods would enter into the contract for the second parcel.

The two principals of Garrison–Ashburn, L.C. and Garrison–Woods, L.C. are Cralle Z. Comer and Stephen H. Chapman. Each owns a fifty percent membership interest.[2] While Chapman was the initial Operating Manager for each entity, Comer was later substituted as Operating Manager of each entity. Chapman filed a voluntary petition in bankruptcy pursuant to chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida on September 23, 1999. The case was transferred to this court on February 15, 2000. Chapman remains in possession in his personal case.[3] Comer and the secured creditors favored the sales; Chapman opposed them.

Chapman asserts that the court ignored the issue of whether Garrison–Woods could enter into the related contract. He asserts that, as a matter of law, Garrison–Woods cannot sell its parcel without Chapman's consent. In particular, he argues that Article IV, Section 11 of the Operating Agreement requires all deeds and sales contracts be executed by both members of the limited liability company. Chapman will not sign the contract or the deed. The issue Chapman focuses on in his motion to reconsider is a material issue. Without a sale of the Garrison–Woods' parcel the Garrison–Ashburn contract cannot go forward. Both Garrison–Ashburn and Garrison–Woods are manager-controlled Virginia limited liability companies. They are not member-controlled.[4] *See* VA. CODE ANN. § 13.1–1022. Consequently, the issue resolves to the authority of the manager of Garrison–Woods.

Comer testified that he had been substituted as the Operating Manager of both entities in the place of Chapman after their formation and that, as Operating Manager, he was fully authorized to execute the Garrison–Woods contract. There was no evidence to the contrary at the hearing. Chapman now seeks to supplement the record with two exhibits, the Operating Agreement of Garrison–Woods, L.C. and the Minutes of the First Meeting of the Members of Garrison–Woods, L.C.

A Rule 59(e) motion to alter or amend an order requires a showing that relief is appropriate to accommodate an intervening change in controlling law; account for new evidence not available at trial; correct a clear error of law; or prevent a manifest injustice. *Hutchinson v. Staton,* 994 F.2d 1076, 1081 (4th Cir. 1993). It may not be used to present evidence that could have reasonably been presented before the entry of the judgment. Comer testified that he was authorized to bind Garrison–Woods. There was no credible evidence to the contrary at the hearing. It is, therefore, too late to supplement the record with the Minutes and the Operating Agreement. *Equal Employment Opportunity Comm'n v. Lock-*

---

prior hearing, oral argument is unnecessary. LBR 9013–1(L).

**2.** There was some question as to the exact ownership interest of each member; however, they are either equal owners or close to equal owners. Their exact ownership interest is not necessary for the determination of the motion and no finding is made as to it.

**3.** Cralle Z. Comer was designated by the court to perform the duties imposed upon Garrison–Ashburn by the Bankruptcy Code.

**4.** The parties did not contest this issue at the hearing. Moreover, even if the Operating Agreement proffered to the court as a part of the motion to reconsider were considered, it clearly shows that the company is a manager-controlled limited liability company.

*heed Martin Corp., Aero & Naval Sys.,* 116 F.3d 110, 112 (4th Cir.1997). *See* 12 MOORE'S FEDERAL PRACTICE § 59.30[5][a], at 59–103 to 59–105 (3rd ed., 1998). Notwithstanding this restriction, even if the newly proffered evidence were considered, the court is satisfied that Comer can bind Garrison–Woods and consummate the contract without Chapman's consent or participation.

The proffered documents do not contradict Comer's testimony. While the Minutes and the Operating Agreement identify Chapman as the initial Operating Manager, they are not inconsistent with Comer's testimony that he is the current Operating Manager. Chapman offers nothing to cause the court to reconsider its finding that Comer is the Operating Manager of Garrison–Woods.

The heart of Chapman's argument, though, is Article IV, Section 6 of the Operating Agreement which addresses the powers of the Operating Manager. This section states in part:

> *Operating Manager.* The Operating Manager shall be the chief executive office *[sic]* of the Company and shall have the general charge of the business and affairs of the Company, subject, however, to the right of the Members to confer specified powers on officers and subject generally to the direction of Members.... The Operating Manager shall also have the sole and complete control of the management and operation of the affairs and business of the Company. Without limiting the foregoing, the Operating Manager shall have full and complete authority in his sole and exclusive discretion to execute on behalf of the company, any listing agreement, contract or other paper.

Article IV, Section 11 of the Operating Agreement states in part:

> *Signature Authority.* Without limiting the foregoing, the signatures of both the Operating Manager and the Assistant Operating Manager shall be required for, and they shall have full and com-

plete authority in their sole and exclusive discretion to:

> a. Execute on behalf of the Company, any bond or deed, execute or endorse promissory notes and renew the same from time to time;
>
> b. Draw upon any bank or banks or any corporations, associations, or individuals for any sum or sums of money that may be to the credit of the Company, or which the Company may be entitled to receive;
>
> c. Make all necessary deeds and conveyances thereof of Company real and/or personal property, wheresoever located, with all necessary covenants, warranties, and assurances, and to sign, seal, and acknowledge and deliver the same;

The Assistant Operating Manager has no duties except in the absence of the Operating Manager. Operating Agreement, Article IV, Section 7.

Chapman argues that pursuant to Article IV, Section 11, he "along with Comer, must also sign such a contract for it to be legally binding." Motion for Reconsideration ¶ 4. This argument is contrary to the plain meaning of the Operating Agreement. The Operating Agreement plainly vests in the Operating Manger "the sole and complete control of the management and operation of the affairs and business of the Company" and the "full and complete authority... to execute on behalf of the Company" any contract. Operating Agreement, Article IV, Section 6. The Operating Manager controls the business affairs of the company pursuant to Section 6. This includes the ability to sell the principal property of the company thereby realizing the company's objective. Section 11 by its express terms does not limit this authority. Moreover, it does not require both ***members*** to execute a deed, as suggested in the Motion, but rather two ***officers***, the Operating Manager and the Assistant Operating Manager. At best, if Chapman is the Assistant Operating Man-

ager—a proposition without evidentiary support—Section 11 requires the deed that would be necessary to consummate the contract be signed by Comer. as Operating Manager and Chapman as Assistant Operating Manager.

Chapman fails to consider the effect of the filing of his voluntary petition in bankruptcy on his rights in the limited liability company. Section 13.1–1040.1 of the Code of Virginia provides that a member is "dissociated" from a limited liability company upon the occurrence of certain events, one of which is filing a petition in bankruptcy. VA. CODE ANN. § 13.1–1040.1(6)(a). Prior to July 1, 2000, the Code of Virginia did not clearly set forth the consequences of becoming "dissociated." However, the 2000 General Assembly amended the Virginia Limited Liability Company Act, §§ 13.1–1000 et seq., effective July 1, 2000, by adding § 13.1–1040.2 which provides as follows:

§ 13.1–1040.2. Effect .of a member's dissociation.

A. Except as provided in the articles of organization or an operating agreement, the dissociation of a member shall not affect the membership interest held by the dissociated member or the former member's successor in interest. The former member or successor in interest shall continue to hold a membership interest and shall have the same rights that an assignee of the membership interest would have under § 13.1–1039.

B. Except as provided in the articles of organization or an operating agreement, the dissociation of a member shall not cause the limited liability company to be dissolved or its affairs to be wound up, and, upon the occurrence of any such event, the limited liability company shall be continued without dissolution.

Section 13.1–1039 states:

An assignment does not entitle the assignee to participate in the management

and affairs of the limited liability company or to become or to exercise any rights of a member. Such an assignment entitles the assignee to receive, to the extent assigned, only any share of profits and losses and distributions to which the assignor would be entitled.

The term "membership interest" is defined in § 13.1–1002 of the Code of Virginia. It is defined as "a member's share of the profits and the losses of the limited liability company and the right to receive distributions of the limited liability company's assets." VA. CODE ANN. § 13.1–1002.

Consequently, the present law of the Commonwealth of Virginia, unless otherwise affected by the Bankruptcy Code, effects a dissociation of a member of a limited liability company upon the member filing a petition in bankruptcy. Dissociation of a member does not dissolve the company. The company continues in existence. The effect on a member of becoming dissociated from a limited liability company is to divest the member of all rights as a member to participate in the management or operation of the company. The only rights remaining are the dissociated member's economic rights, his membership interest as defined in § 13.1–1002 of the Code of Virginia. That is to say, the dissociated member is expelled from the company, but does not forfeit the value of his ownership interest.

The question presented by Chapman is whether Garrison–Woods can lawfully execute and consummate a contract for the sale of its real estate. Under present Virginia law, when Chapman filed his voluntary petition, he ceased to be a member and had no further voice or vote in the management of Garrison–Woods. Comer, as the sole remaining member, has the unilateral power to remove Chapman as Assistant Operating Manager at any time and elect a new Assistant Operating Manager.[5] The new Assistant Operating Man-

---

**5.** Any officer may be removed from office by the members at any time with or without cause. Operating Agreement, Article IV, Section 3. See also VA. CODE ANN. § 13.1–

ager need not be a member of the company. VA..CODE ANN. § 13.1–1024(B). In any event, Comer could elect himself the new Assistant Operating Manager. Article IV, Section 1 of the Operating Agreement provides that any two or more offices may be held by the same person. The restriction Chapman raises in his motion to reconsider would not prevent Garrison–Woods from executing the sales contract for its parcel or from consummating the sale. The legal authority, and the intention, to execute the contract and consummate it are both present. The contract approved by the court can be fully consummated.

The remaining question of Virginia law is the retroactive effect of § 13.1–1040.2. The court concludes that § 13.1–1040.2 is merely declaratory of the law in effect on September 23, 1999, the date Chapman filed his petition in bankruptcy. Limited liability companies are of relative recent origin. They seek to blend elements of partnerships and corporations for purposes of management, taxation and limited liability. *See Broyhill v. DeLuca (In re DeLuca)*, 194 B.R. 65, 74 (Bankr.E.D.Va. 1996). The first limited liability company statute was enacted by Wyoming in 1977. Only Florida followed suit until 1988 when the Internal Revenue Service issued Revenue Ruling 88–76 which ruled that a Wyoming limited liability company would be classified as a partnership for tax purposes. Rev. Rul. 88–76, 1988–2 C.B. 360. Within eight years, every state and the District of Columbia enacted its own limited liability company statute. Sally S. Neely, *Partnerships and Partners and Limited Liability Companies and Members in Bankruptcy: Proposals for Reform*, 71 Am.Bankr.L.J. 271, 281–82 (1997). In order for an entity to be classified as a partnership for tax purposes prior to January 1, 1997, it had to have fewer noncorporate attributes than corporate attributes.

There were only four relevant corporate attributes: (1) continuity of life; (2) centralized management; (3) limited liability; and (4) free transferability of interests. 26 C.F.R. § 301.7701–2(a)(3) (1996); Neely, *id.* at 280. Consequently, in order to be classified as a partnership for tax purposes, a limited liability company could not have more than two of the corporate attributes. Since one central purpose of a limited liability company was to limit the liability of the members, the corporate attribute of limited liability was always present. This meant that a limited liability company could not have more than one of the remaining three corporate attributes.

As originally enacted, the Virginia Limited Liability Company Act provided that a limited liability company would be dissolved and its affairs wound up upon the occurrence of certain events. VA. CODE ANN. § 13.1–1046. These included the death, resignation, expulsion, bankruptcy or dissolution of a member or any other occurrence that terminated the membership of a member unless the remaining members consented to the continuation of the company. This precluded a Virginia limited liability company from having the attribute of continuity of life. 26 C.F.R. § 301.7701–2(b) (1996).

Membership interests were not freely transferrable. Subsection (e) of § 301.7701–2 of the 1996 Regulations provided as follows:

**(e) Free transferability of interests.** (1) An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization. In order for this power of substitution to exist in the corporate sense, the member

1024(F). Moreover, there was no evidence of Chapman becoming Assistant Operating Man-

ager.

must be able, without the consent of other members, to confer upon his substitute all the attributes of his interest in the organization. Thus, the characteristic of free transferability of interests does not exist in a case in which each member can, without the consent of other members, assign only his right to share in profits but cannot so assign his rights to participate in the management of the organization.

The Virginia Limited Liability Company Act permitted the assignment of a member's interest, but limited it only to his share of profits and losses and distributions. It expressly excluded the assignee from participating in the management and affairs of the company, from becoming a member of the company and from exercising any rights of a member. VA. CODE ANN. § 13.1–1039. Section 13.1–1039 complied with the strictures of 26 C.F.R. § 301.7701–2(e) (1996). Therefore, a Virginia limited liability company did not possess the corporate attribute of free transferability of interests.

This left only one corporate attribute—centralized management. Since, by statute, a Virginia limited liability company had the corporate attribute of limited liability and did not possess the corporate attributes of continuity of life or free transferability of interests, the fourth corporate attribute was not determinative for tax purposes. In no event would a company have more corporate attributes than noncorporate attributes. The Virginia Limited Liability Company Act permitted companies to select whether they would be member-controlled or manager-controlled, although the default was for member control. VA. CODE ANN. § 13.1–1022.

In 1996, the Internal Revenue Service announced a change in the manner in which it would classify entities for tax purposes. Effective January 1, 1997, new regulations permitted an unincorporated entity to elect the manner in which it would be taxed. *See* 26 C.F.R. §§ 301.7701–1 *et seq.* (1997); Neely, *id.* at 280–81. The 1998 Virginia General Assembly responded to the change in the Regulations by changing the provisions that prevented a limited liability company from having the corporate attribute of continuity of life. It amended § 13.1–1046 by deleting the reference to events that would automatically dissolve a limited liability company. As of July 1, 1998, a Virginia limited liability company is not dissolved upon the death, resignation, retirement, expulsion, bankruptcy or dissolution of a member. It is dissolved only at the time or upon an event specified in the articles of organization or operating agreement, upon the unanimous written consent of the members, at any time there are no members, upon the entry of a decree of judicial dissolution or upon the automatic cancellation of its certificate. *See* 1998 Va. Acts ch. 432; VA. CODE ANN. § 13.1–1046. This amendment is all the more significant when compared with the 1995, 1996 and 1997 amendments. 1995 Va. Acts ch. 168; 1996 Va. Acts ch. 265; 1997 Va. Acts ch. 190. Each prior amendment to § 13.1–1046 merely modified the events of dissolution or the process by which it could be avoided after an event of dissolution. The 1998 amendment was a clear change and is clearly understood in light of the change in the Internal Revenue Service regulations. The Virginia statutory requirement that prevented the continuity of life corporate attribute from attaching to Virginia limited liability companies necessarily permitted events over which the company had no control to jeopardize its very existence, potentially in the prime of its economic life. With the change in the IRS regulations, it was no longer necessary to avoid this corporate attribute. Potentially serious problems could be avoided by eliminating dissolution upon enumerated unforeseen events. As of July 1, 1998, a Virginia limited liability company may have, effectively, perpetual existence.

The same Act that gave Virginia limited liability companies perpetual existence also added § 13.1–1040.1 which addressed

events causing a member's dissociation. The events that previously led to the dissolution of the company now result in the member's dissociation. Dissolution of the company is clearly different from dissociation of a member. Upon dissolution of the company, the business of the company is wound up. VA. CODE ANN. § 13.1–1048. Winding up is completed when all debts, liabilities and obligations of the company have been paid, or a reasonable adequate provision made for them, and all remaining property has been distributed to the members. VA. CODE ANN. § 13.1–1050(A). Upon completion of the winding up process, the company files a certificate of cancellation with the State Corporation Commission.

Significantly, the General Assembly did not change the effect of an assignment of a member's interest in a limited liability company. The ability to assign a membership interest remained. The inability of an assignee to participate in the management of the company remained. Section 13.1–1040(A) provides that an assignee may only become a member by consent of the manager-members or the members as set out in the statute. An assignee does not automatically become a member.

Dissociation of a member does not result in the winding up or liquidation of the company. The company continues. While the member may be expelled, no provision of the Virginia Limited Liability Company Act affects his membership interest. A "membership interest" is the "member's share of the profits and the losses of the limited liability company and the right to receive distributions." VA. CODE ANN. § 13.1–1002. Since a dissociated member is no longer a member of the company, he does not have any management rights under § 13.1–1022 and may not bind the company under § 13.1–1021.1. While he retains his membership interest, he stands in the same relationship to the company as an assignee of his membership interest. *See* VA. CODE ANN. § 13.1–1039.

The General Assembly protected limited liability companies from automatic dissolution arising from certain enumerated events, an action that can destroy a profitable business and which may have serious collateral effects on the other members. It further sought to minimize the effect of these events by expelling the affected member. The expelled member, however, was protected as to his economic interests. There was no forfeiture of the membership interest. A contrary conclusion would negate the clear intention of the amendment to § 13.1–1046 made by the 1998 General Assembly that bankruptcy and other specified events not automatically cause the dissolution of the company and that dissociation of a member not effect a forfeiture of the dissociated member's economic interest, a result not favored by the law. The 2000 amendment makes these effects of dissociation clear. It is merely declaratory of the change effected by the 1998 amendment.[6] Therefore, under Virginia law, Chapman ceased to be a member of Garrison–Woods on September 23, 1999, the day he filed bankruptcy in Florida.

There is a lurking federal question: Is § 13.1–1040.1(6)(a), the dissociation of a member upon filing a petition in bankruptcy, effective in light of Sections 365(c), 365(e) and 541(c) of the Bankruptcy Code?

 The first part of the question concerns what becomes property of the bankruptcy estate of the member in light of § 541(c). Nothing in the Operating Agreement in this case or in the Virginia Limited Liability Company Act purports to prevent the transfer of the membership interest to the bankruptcy estate. There is no question that the economic rights, that is the membership interest, becomes property of the estate. But, what of Chap-

---

6. The 1998 and 2000 amendments should also be considered against the backdrop of the amendments to the partnership statutes. The 1996 General Assembly enacted VA. CODE ANN. § 50–73.111 (effective July 1, 1997) which addresses the effect of a partner's dissociation. A partner's dissociation has a similar effect as a member's dissociation.

man's non-economic rights and privileges as a member, that is, his right to participate in management? Section 541 was intentionally broadly drafted. It was an intentional and significant change from the Bankruptcy Act of 1898. 5 COLLIER ON BANKRUPTCY ¶ 541.LH[3][a], at 541–108 (Lawrence P. King et al., eds., 15th ed. rev.2000). Section 541(a) clearly encompasses all of Chapman's interest in Garrison–Woods, whatever that interest may be, whether economic or non-economic. Section 541(c) makes plain that no restriction on the transfer of any interest of a debtor—whether it arises from the operative documents themselves or from applicable nonbankruptcy law—prevents an interest from becoming property of the estate. Chapman's interest in Garrison–Woods, both his membership interest and his non-economic rights and privileges as a member, became property of the bankruptcy estate. All the rights and privileges Chapman had immediately prior to filing became property of his bankruptcy estate. Unless otherwise provided in the Bankruptcy Code, the rights and benefits were burdened with all of the duties and obligations that came with them. Consequently, unless precluded by § 365(c) or (e), his bankruptcy estate has only the rights of an assignee under § 13.1–1039.

■■■ The second part of the question concerns the impact of § 365(c) and (e). Both provisions prevent the enforcement of certain bankruptcy *ipso facto* provisions in executory contracts and unexpired leases. The threshold issue is whether there is an executory contract in this case. The Bankruptcy Code does not define the term "executory contract." However, the legislative history and, generally, case law cite with approval Professor Countryman's definition: "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." 3 COLLIER ON BANKRUPTCY ¶ 365.02[1], at 365–17 n. 1 (Lawrence P. King et al., eds., 15th ed. rev.2000) (quoting Countryman, *Executory Contracts in Bankruptcy*, 57 Minn.L.Rev. 439, 446 (1973)). Courts have examined this issue principally in relation to partnership matters, although with the rise of limited liability companies, the issue is being addressed more frequently in this context as well. *See, e.g., Breeden v. Catron (In re Catron)*, 158 B.R. 629 (E.D.Va.1993), *aff'd*, 25 F.3d 1038 (4th Cir.1994) (unpublished table decision); *In re Antonelli*, 148 B.R. 443 (D.Md.1992), *aff'd*, 4 F.3d 984 (4th Cir.1993) (unpublished table decision); *JTB Enters., L.C. v. D & B Venture, L.C. (In re DeLuca)*, 194 B.R. 79 (Bankr. E.D.Va.1996); *Broyhill*, 194 B.R. at 65. While each of these cases addresses difficult aspects of this issue, all pre-date the present Virginia statute. Each was decided before the change in the Internal Revenue Service regulations when the continuity of the life of the entity was a factor that had to be addressed in the underlying partnership or company documents or in the enabling state statutes. This case does not concern an entity whose organic documents or enabling statute dissolves the entity on the filing of a member's petition in bankruptcy. These cases, while instructive, are not determinative here.

In this case, the Operating Agreement merely provides the structure for the management of the company. It imposes no additional duties or responsibilities on the members. Article I makes provision for offices of the company. Article II concerns meetings and voting. Article III addresses committees and Article IV, officers. Articles VI through X resolve certain formal issues: membership certificates, record date for members, statutory notice, fiscal year, company seal and books and records. Article XI relates to the limitation of liability of members and their indemnification. Article XII concerns amendments. There is no obligation to provide additional capital; no obligation to participate in management; and no obligation to provide any personal expertise or

service to the company.[7] In fact, Article V provides that any officer or committee member may resign at "any time by giving written notice." The resignation takes effect at the time specified, or if none is specified, upon receipt, "irrespective of whether any such resignation shall have been accepted." In short, either member can, without being in breach of the Operating Agreement, resign from all his offices and committee positions and no longer actively participate in the affairs of the company. He would stand in an analogous position to the company as a shareholder to a corporation. In the circumstances of this case, there is no executory contract, the provisions of § 365(c) and (e) are not applicable, and Chapman was disassociated from Garrison–Woods, L.C. by virtue of Virginia law.

This result does not offend the Congressional intention behind Sections 541(c) and 365(c) and (e). These provisions were intended to expand the bankruptcy estate to the maximum feasible extent and to prevent the loss of valuable assets by the operation of *ipso facto* clauses that terminate valuable leases and other rights upon bankruptcy. Here the estate received the entire interest of the debtor in Garrison–Woods including its burdens and restrictions. The economic interest, that is the membership interest, remains in the estate and is available for the benefit of creditors. The enforcement of Chapman's statutory dissociation does not cause a forfeiture of those rights or impair the legal capacity of the company to continue in business.

Chapman seeks reconsideration of this court's order authorizing the sale of property of this bankruptcy estate arguing that the approval of the sale is futile because Comer cannot effect the sale of the companion parcel owned by the non-debtor limited liability company without his consent and participation. This issue was considered at the hearing. Chapman has presented nothing that changes the court's determination that Garrison–Woods, the non-debtor limited liability company, can lawfully consummate its part of the contract and intends to do so. The motion for reconsideration will be denied.

---

7. Unlike partnerships, there are no fiduciary obligations among members. The Virginia Code imposes a duty of "good faith business judgment of the best interests of the limited liability company" on managers but is silent as to members. VA. CODE ANN. § 13.1–1024.1(A). Moreover, members may, by express provision of the Virginia Limited Liability Company Act, transact business with a company of which they are a member on the same basis as a non-member. VA. CODE ANN. § 13.1–1026. *Cf.* VA. CODE ANN. § 50–73.102(B), (D). The absence of any statutory fiduciary obligation of one member to another or to the company is significant. Limited liability companies are statutory creations, not common-law creations like partnerships. Fiduciary obligations are expressly provided in the Virginia Revised Uniform Limited Partnership Act, VA. CODE ANN. § 50–73.1 *et seq.*, and the Virginia Uniform Partnership Act, VA. CODE ANN. § 50–73.79 *et seq. See, e.g.,* §§ 50–73.29, 50–73.99, 50–73.101, 50–73.102. *See also* VA. CODE ANN. § 50–21 (repealed effective January 1, 2000).